*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOHN J. HAYES,

      Plaintiff-Appellant,

v

GINOSKO DEVELOPMENT COMPANY, AMIN
IRVING and MARY TISCHLER,

      Defendant-Appellees.

UNPUBLISHED
February 28, 2019

No. 340725
Oakland Circuit Court
LC No. 2016-154700-CB

Before: JANSEN, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

In this dispute involving interpretation of a stock redemption agreement, plaintiff, John Hayes, appeals by right from an order granting summary disposition to defendants Ginosko Development Company, Amin Irving, and Mary Tischler pursuant to MCR 2.116(C)(8) (failure to state a claim). For the reasons set forth below, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiff incorporated Ginosko Development Company (GDC) in 2002, assigning 49% of its stock to himself and 51% to defendant Amin Irving. In 2012, the company employed defendant Mary Tischler as its chief financial officer. Also in 2012, the individual parties entered into certain agreements that restructured GDC's operation and ownership. These included an employment agreement, whereby plaintiff became GDC's chief executive officer, and a partial stock redemption agreement (PSRA), whereby GDC agreed to redeem stock from plaintiff amounting to 15% of his ownership interest. The plan was that Tischler would receive the stock and reimburse GDC its purchase price. In accordance with the provisions of the PSRA, an independent valuation firm valued plaintiff's 15% interest in GDC. Plaintiff disagreed with the initial valuation and informed GDC of his disagreement, but, according to plaintiff, GDC declined to comply with the PSRA's provisions for resolving the valuation dispute.

-1-

On December 16, 2015, plaintiff and the individual defendants[1] signed an agreement providing for plaintiff's termination and buyout. Section 1 of the December 2015 Agreement set forth the terms of plaintiff's termination, and § 2(c) provided for valuation of plaintiff's stock as follows:

> The purchase price of the Stock (the "Purchase Price") will be the value of the Stock as determined exclusively by Baker Tilly (Michigan) under Article III Option A of the Buy-Sell Agreement. The Parties agree that the provisions of Article III Option B will not apply. However, as provided in the Buy-Sell Agreement, the fees and expenses charged by Baker Tilly (Michigan) will be paid solely by the Company. The Purchase Price will be determined as of December 31, 2015. As provided by the Buy-Sell Agreement, the valuation will not include discounts of any kind.

The individual parties had earlier entered into the referenced Buy-Sell Agreement (hereafter "BSA") to provide "for the purchase of a Shareholder's stock interest upon certain conditions." Article III, Option A, of the BSA provides for determination of the stock's purchase price as follows:

> The purchase price for the shares of the Corporation to be purchased hereunder shall be their fair market value as of the end of the month preceding the event giving rise to a purchase and sale, as determined by an independent valuation firm mutually agreed upon by the Selling Shareholder (or such Shareholder's legal representative) and the Purchaser(s). For purposes of this Agreement, a Selling Shareholder shall mean a Shareholder who is selling his/her shares due to such Shareholder's death, disability, retirement or other event subject to this Agreement. In the event the Selling Shareholder and the Purchaser(s) do not agree on the price set by the independent valuation firm, the price shall be set in accordance with Option B. The valuation shall be determined under the same methods as would be used for determining the estate tax value of the shares being sold hereunder as if the Selling Shareholder has died on the valuation date, ignoring any alternative valuation date (under IRC 2032) or special use valuation (under IRC 2032A). The Corporation shall provide such data as the valuation firm deems necessary or useful to make such determination of the fair market value of the shares being sold. The fees and reimbursed expenses charged by the valuation firm in the valuation under this Article shall be borne solely by the Corporation. The valuation and stock purchase price shall not include discounts of any kind, provided, however, any valuation by the independent valuation firm using the income method may still be allowed to reduce to present value. The event giving rise to a purchase and sale shall be (i) the date on which the retiring or withdrawing Shareholder's notice under Article VI is given to the Corporation,

---

[1] Various GDC affiliates were also party to the December 2015 Agreement. They are not party to this appeal.

(ii) the date of death of the Shareholder, or (iii) the date of the event giving rise to a total and permanent disability under Article VII.

The BSA's Option B provides in relevant part:

If Option A is not followed, the purchase price for the shares of the Corporation to be purchased hereunder shall be their fair market value as of the end of the month preceding the event giving rise to a purchase and sale, as determined by submitting the matter to arbitration as provided below. The Purchaser(s) and the Selling Shareholder (or his/her legal representative) shall each name one independent accountant. If the two (2) accountants cannot agree upon the fair market value within forty-five (45) days, they shall appoint a third accountant and the decision of the majority shall be binding upon all parties. . . .

Baker Tilly valued plaintiff's remaining stock in accordance with the provisions of the December 2015 Agreement. Plaintiff disagreed with the valuation, informed GDC of his disagreement, and reiterated his disagreement with the earlier valuation of 15% of his stock under the PSRA. Plaintiff insisted that the December 2015 Agreement obligated GDC to resolve the valuation dispute in accordance with the provisions set forth in Option B of the BSA. When GDC disagreed, plaintiff filed a two-count complaint. He alleged in Count I that GDC breached the PSRA by not complying with Option B after he disagreed with the 2012 valuation, and in Count II that all defendants breached the December 2015 Agreement and the BSA by not complying with Option B after he disagreed with the Baker Tilly valuation. The instant appeal involves Count II only.

Defendants responded to plaintiff's complaint with separate motions for summary disposition.[2] With respect to Count II, defendants argued that the December 2015 Agreement superseded the BSA with respect to redemption of plaintiff's remaining stock, and that it expressly stated the parties' intent that the value of plaintiff's stock was to be "determined expressly by Baker Tilly" and "that the provisions of Article III Option B will not apply." Because the December 2015 Agreement expressly stated that Option B "will not apply," defendants' refusal to comply with the provisions of Option B did not breach the agreement. Because the December 2015 Agreement superseded the BSA for purposes of GDC's redemption of plaintiff's remaining stock, defendants' non-compliance with Option B did not breach the BSA. For these reasons, defendants argued, Count II of plaintiff's claim fails as a matter of law and should be dismissed.

Plaintiff argued in response that the December 2015 Agreement did not expressly eliminate the dispute resolution provision of Option A, it merely prohibited the parties from choosing Option B of the BSA as the initial means of determining the purchase price of plaintiff's shares. Defendants' position, plaintiff argued, rendered nugatory a portion of Option

---

[2] The individual defendants moved for summary disposition of Count II pursuant to MCR 2.116(C)(8), and GDC incorporated by reference their arguments.

A. Plaintiff argued in the alternative that ignoring Option A's reference to Option B created ambiguities in the December 2015 Agreement that the trial court should leave to a jury to resolve, such as the meaning of the "Option B will not apply" language and how the parties were to resolve valuation disputes.

Subsequent to oral argument, the trial court granted defendants' motions for summary disposition of Count II. The court indicated in its reasoning that, to the extent that Option A incorporated Option B, the parties' agreement that the statement in the December 2015 Agreement that "the provisions of Option B will not apply" prevailed because it unambiguously expressed the parties' intent, and to ignore it would impermissibly render the phrase nugatory. This appeal followed.

## I. ANALYSIS

Plaintiff first contends that the trial court erroneously interpreted the parties' December 2015 Agreement as prohibiting the parties from turning to the BSA's Option B to resolve the dispute with the valuation of plaintiff's GDC stock. Based on this incorrect interpretation, the trial court erred by granting defendants' motions for summary disposition. Plaintiff argues that at the very least, the trial court's interpretation of the agreement created ambiguities that the court should have left to a jury to resolve. We disagree. This Court reviews de novo a trial court's decision on a motion for summary disposition based on a party's failure to state a claim. *Bailey v Schaaf*, 494 Mich 595, 603; 835 NW2d 413 (2013). Likewise, the Court reviews de novo a trial court's interpretation of contractual language, including whether the language is ambiguous. *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 445; 886 NW2d 445 (2015).

A motion for summary disposition brought pursuant to MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. *Bailey*, 494 Mich at 603. All factual allegations in support of the claim are accepted as true, as well as any reasonable inferences or conclusions that can be drawn from the facts, and are construed in the light most favorable to the nonmoving party. *Johnson v Pastoriza*, 491 Mich 417, 435; 818 NW2d 279 (2012); *Gorman v American Honda Motor Co*, 302 Mich App 113, 131; 839 NW2d 223 (2013). A motion under MCR 2.116(C)(8) is properly granted only when a claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Johnson*, 491 Mich at 435.

This Court's main goal when interpreting contracts is to honor the intentions of the parties, the best evidence of which are the words used in the contract. *Kyocera Corp*, 313 Mich App at 446. "When contract language is clear, unambiguous, and has a definite meaning, courts do not have the ability to write a different contract for the parties, or to consider extrinsic testimony to determine the parties' intent." *Id*. (quotation marks and citation omitted). If a contract's language is unambiguous, this Court "construe[s] and enforce[s] the contract as written." *In re Estate of Koch*, 322 Mich App 383, 398; 912 NW2d 205 (2017). "A contract is ambiguous when its provisions irreconcilably conflict," *Id*, or if a term is "equally susceptible to more than a single meaning," *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40; 892 NW2d 794 (2017). Contracts must be read as a whole, and their terms given their commonly used meanings unless defined in the contract. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292, 294; 778 NW2d 275 (2009).

Plaintiff first argues that the trial court's interpretation "negates" the provision in the BSA's Option A instructing shareholders to follow the steps in Option B to resolve any disputes regarding the valuation of stock. Plaintiff implies that the December 2015 Agreement incorporates the BSA and, therefore, that the trial court should have interpreted § 2(c) of the Agreement and Option A of the BSA as a whole. See *In re Estate of Koch*, 322 Mich App at 399. ("When a contract incorporates a writing by reference, it becomes part of the contract, and courts must construe the two documents as a whole."). Assuming arguendo that the December 2015 Agreement incorporated by reference the BSA, plaintiff provides no authority for his assumption that, where the language of § 2(c) of the December 2015 Agreement expressly prohibiting the applicability of Option B conflicts with language in the BSA instructing shareholders to follow Option B to resolve valuation disputes, the BSA controls.

The structure of § 2(c) of the December 2015 Agreement suggests that to the extent § 2(c) incorporated by reference Option A of the BSA, incorporation was selective. The first sentences of the BSA's Option A and § 2(c) of the December 2015 Agreement describe how to determine the purchase price of the stock on offer. Option A states that the stock's purchase price will be the fair market value of the shares on a designated date as determined by a mutually agreed upon valuation firm. Section 2(c) names Baker Tilly as the mutually agreed upon valuation firm and identifies Option A as the method for calculating the stock's value. Immediately following these basic instructions, the BSA's Option A provides a means of resolving disputes about the initial purchase price; specifically, "the price may be set in accordance with Option B." Section 2(c) parallels Option A's reference to Option B, but states contrariwise, "[t]he parties agree that the provisions of Article III Option B will not apply." The third sentence of § 2(c) provides the designated valuation date, while the remainder of the section expressly traces certain provisions to the BSA with the phrase, "as provided in the [BSA]." For example, "as provided in the [BSA]," GDC will pay Baker Tilly's fees and costs, and, "as provided in the [BSA]," "valuation will not include discounts of any kind." The structural similarities between the BSA's Option A and § 2(c) of the December 2015 Agreement, along with the specific references that certain provisions of § 2(c) follow those of the BSA, belie an intent to incorporate Option A wholly and as written into § 2(c). Instead, the similarities and differences of the two provisions reflect the construction of a unique valuation provision arrived at by adopting and adapting the provisions of Option A. This adaptation included expressly rejecting Option A's call for using the provisions of Option B to resolve valuation disputes.

Plaintiff next argues that the rules of construction mandate rejection of the provision in § 2(c) that "the provisions of Option B will not apply." Plaintiff contends that the first and second sentences of § 2(c) conflict because the first sentence's reference to Option A effectively incorporates Option B, but the second sentence states that the provisions of Option B will not apply. When this occurs, the rules of construction mandate that the first provision is controlling and the latter rejected. See *Klever v Klever*, 333 Mich 179, 189; 52 NW2d 653 (1952). Rejecting the second provision, i.e., that the provisions of Option B will not apply, means that Option B is available as a means of resolving his disagreement with Baker Tilly's valuation. Plaintiff's argument is unpersuasive and his reliance on *Klever* unavailing.

At issue in *Klever* was the interpretation of certain provisions in a reconciliation agreement between the plaintiff-wife and her now-deceased husband. Paragraph three of the agreement stated that if certain conditions were met and the husband predeceased the plaintiff,

the plaintiff would be entitled to all of the real and personal property owned by the husband, "or of which he shall die seized." *Id*. at 184. The conditions set forth in paragraph three having been met, the plaintiff relied on the paragraph's provisions to support her claim to all of the property at issue. Paragraph four stated that if certain conditions regarding a mortgage the plaintiff had given her husband nearly two decades earlier were fulfilled, " 'the obligations of the parties hereto under said [mortgage agreement], and under this agreement, shall hereupon cease and terminate.' " *Id*. at 185. The defendant, brother of the plaintiff's deceased husband, argued that paragraph four terminated the decedent's obligations under paragraph three, which meant that the plaintiff was not entitled to all of the decedent's property. Since the husband had died intestate with plaintiff and defendant as sole heirs, each was entitled to half of the decedent's estate, which included the land at issue. *Id*. at 186-187. The trial court found in favor of the plaintiff, and the defendant appealed in the Michigan Supreme Court.

Michigan's Supreme Court elected to resolve the conflict between the two paragraphs by reading and understanding the agreement "in a way that will render all of its provisions consistent and meaningful, and in full accord with the obvious intent of the parties." *Id*. at 188. Accordingly, the Court held that the parties had in mind that once the husband fulfilled the conditions pertinent to the mortgage, his obligation as to the mortgage agreement would "cease and terminate," but not his obligations under paragraph three, which was unrelated to the mortgage. *Id*. In support of its holding, the Court noted that the provisions in paragraph three preceded the relevant provision in paragraph four and observed, "one of the rules of construction to which resort may be had is that where in an instrument there are two conflicting clauses or provisions, the first shall be received as controlling and the latter rejected." *Id*. at 189.

The present plaintiff relies on the *Klever* Court's latter observation regarding the rules of construction to argue that the trial court in this case should have rejected the second sentence of § 2(c), which precluded use of the provisions of Option B. Plaintiff's reasoning is flawed. Whereas the conflict in *Klever* arose from language in two provisions of the *same* instrument, the conflict that plaintiff alleges is between provisions of *different* instruments, Option A of the BSA and § 2(c) of the December 2015 Agreement. Moreover, whereas the conflict in *Klever* emerged from reading and considering the provisions in the reconciliation agreement, the alleged conflict here arises only because plaintiff ignores the clearly expressed provision in the December 2015 Agreement stating, "[t]he parties agree that the provisions of Option B will not apply." The *Klever* Court resolved the conflict between paragraphs three and four of the reconciliation agreement by reading and understanding the provisions in a way that "would render all of its provisions consistent and meaningful, and in full accord with the obvious intent of the parties." *Klever*, 333 Mich at 188. In the present case, the December 2015 Agreement states that valuation will be determined under Option A, and that the provisions of Option B will not apply. There is no contradiction on the face of these two provisions and, even if Option A does recommend recourse to the provisions of Option B to resolve valuation disputes, the December 2015 Agreement memorializes the parties' agreement in unqualified terms "that the provision of Article III Option B will not apply." For these reasons, plaintiff's argument that the rules of construction require rejection of the second sentence of § 2(c) fails.

Finally, plaintiff argues that interpreting the parties' agreement, "that the provisions of Article III Option B will not apply," to preclude Option A's recourse to the provisions of Option

B to resolve a dispute arising from a valuation determined under Option A, creates an ambiguity. We disagree.

An ambiguity may be patent or latent. *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). A patent ambiguity is one that appears on the face of the instrument. *Id*. Plaintiff does not argue that the December 2015 Agreement contains a patent ambiguity. Rather, he suggests a latent ambiguity arising from the court's interpretation of the second sentence of § 2(c) to preclude any recourse to the provisions of Option B. A latent ambiguity is one

> that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed. Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist. [*Id*. at 668.]

The essence of plaintiff's latent-ambiguity argument is that the trial court's interpretation of the December 2015 Agreement raises questions about how the parties are going to resolve disputes about valuation if they cannot resort to the provisions in Option B. However, in order to prove a latent ambiguity, plaintiff had to do more than raise questions about the consequences of the disputed language. He had to present extrinsic evidence indicating the existence of an ambiguity, e.g., other facts that create the "necessity for interpretation or a choice among two or more possible meanings." See *id*. (quotation marks and citation omitted). Plaintiff presents no such evidence. The questions plaintiff asserts arise from the trial court's interpretation of § 2(c) suggest the omission of a dispute resolution provision or a mistake in plaintiff's interpretation of the contract more than a latent ambiguity. "An omission or mistake is not an ambiguity[,]" and extrinsic evidence "under the guise of a claimed latent ambiguity is not permissible to vary, add to, or contradict the plainly expressed terms of [a] writing or to substitute a different contract for it, to show an intention or purpose not therein expressed." *Michigan Chandelier Co v Morse*, 297 Mich 41, 48; 297 NW 64 (1941). Plaintiff has failed to establish a latent ambiguity in the December 2015 Agreement.

Affirmed.

/s/ Kathleen Jansen
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien