# STATE OF MICHIGAN

# COURT OF APPEALS

KYOCERA CORPORATION,

        Plaintiff-Appellant,

v

HEMLOCK SEMICONDUCTOR, LLC,

        Defendant-Appellee.

FOR PUBLICATION
December 3, 2015
9:05 a.m.

No. 327974
Saginaw Circuit Court
LC No. 15-025786-CK

Before: BOONSTRA, P.J., and SAAD and HOEKSTRA, JJ.

BOONSTRA, P.J.

Plaintiff appeals by right the trial court's order granting summary disposition to defendant pursuant to MCR 2.116(C)(8) (failure to state a claim) and dismissing plaintiff's declaratory judgment action. We affirm.

## I. NATURE OF THE CASE

This case involves the interpretation of a "force majeure" clause in a contract. Generally, the purpose of a force majeure clause is to relieve a party from penalties for breach of contract when circumstances beyond its control render its performance untenable or impossible. See *Erickson v Dart Oil & Gas Corp*, 189 Mich App 679, 689; 474 NW2d 150 (1991). The contract at issue is a "take-or-pay" contract. A take-or-pay contract obligates a buyer to purchase a specific quantity of product from the seller (usually also the manufacturer of the product) at a fixed price; if the buyer purchases less than that quantity, it is nonetheless obligated to pay the seller for the full specified quantity at the specified price. See, e.g., *Mobil Oil v Exploration & Producing Southeast Inc v United Distrib Co*, 489 US 211, 230; 111 S Ct 615, 112 L Ed 2d 636 (1991). The very essence of a take-or-pay contract is therefore to allocate to the buyer the risk of falling market prices by virtue of fixed purchase obligations at a long-term fixed price, and to thereby secure for the buyer a stable supply, while allocating to the seller the risk of increased market prices and, by virtue of the buyer's obligation to take or pay for a fixed quantity of product, removing from the seller the risk of producing product that may go unpurchased. See generally Medina, *The take-or-pay wars: a cautionary analysis for the future*, 27 Tulsa L J 283 (1991).

At stake in this case is plaintiff's liability under its take-or-pay contract for the purchase of polysilicon for use in solar panels. If plaintiff is liable under the contract for the full purchase price of all unordered polysilicon for the duration of the contract, plaintiff faces liability of up to

-1-

$1.74 billion. Plaintiff asserts that such a liability would force it to leave the solar panel industry. Nonetheless, as developed below, we conclude that plaintiff contracted for precisely that liability, that plaintiff contractually assumed the very market risks that give rise to that liability, and that the plain language of the force majeure clause at issue does not permit relief to plaintiff on the grounds that the market for polysilicon has shifted, regardless of the cause of that shift. We therefore affirm the trial court's dismissal of plaintiff's complaint for declaratory relief pursuant to MCR 2.116(C)(8).

## II. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff is a Japanese company that produces high-quality solar panels. Defendant is a Michigan company and a large manufacturer of polycrystalline silicon (also called polysilicon), which is used in the manufacture of solar panels. Plaintiff alleges that in 2005 there was a worldwide shortage of polysilicon, and defendant proposed partnering with plaintiff to provide it with a stable supply of polysilicon. According to plaintiff, defendant intended to significantly expand its manufacturing capacity to meet the increased demand for its product, funding this expansion with long-term contracts for the sale of polysilicon.

Between 2005 and 2008, the parties entered into four long-term contracts requiring plaintiff to purchase a certain quantity of polysilicon annually over a period of ten years, and allowing defendant to bill plaintiff for the difference between the quantities of polysilicon plaintiff ordered in a year and the expected order for that year. Plaintiff thus contracted to secure a long-term, stable supply of polysilicon, by virtue of which it protected itself from market disruptions that might threaten that supply. The trade-off was a contracted-for fixed price, and an obligation to pay for quantities of polysilicon for which plaintiff anticipated a need, even if that need ultimately proved to be non-existent. The parties did not (although they could have) negotiate a contractual limitation (e.g., a price floor or ceiling), and therefore plaintiff assumed all downside price risk (if the market price fell) and defendant assumed all upside price risk (if the market price rose). According to plaintiff, the contracts provided for advance payments to be used by defendant in expanding its polysilicon manufacturing infrastructure. Plaintiff alleges that by 2010, it had made $685 million in advance payments on the contracts toward $2.6 billion in total purchases of polysilicon from defendant. Plaintiff asserts that the advance payments allowed defendant to open a new facility in Tennessee, costing approximately $1.2 billion. Each agreement also contained an acceleration clause that rendered plaintiff liable for the full purchase price of all unordered polysilicon for the entire length of the contract in the event of a default in payment.

At issue in this case is the November 13, 2008 long-term supply agreement between the parties ("Agreement IV"), which plaintiff alleges is the "last, and by far the largest" agreement between the parties. Pursuant to that agreement, plaintiff was to pay defendant over $514,848,000 in advance payments for set amounts of polysilicon to be purchased through 2020. The deliveries were scheduled to begin in 2011 and end in 2020. Section 19 of Agreement IV is a force majeure provision, which states as follows:

> Neither Buyer nor Seller shall be liable for delays or failures in performance of its obligations under this Agreement that arise out of or result from causes beyond such party's control, including without limitation: acts of

God; acts of the Government or the public enemy; natural disasters; fire; flood; epidemics; quarantine restrictions; strikes; freight embargoes; war; acts of terrorism; equipment breakage (which is beyond the affected Buyer's or Seller's reasonable control and the affected Buyer or Seller shall promptly use all commercially reasonable efforts to remedy) that prevents Seller's ability to manufacture Product or prevents Buyer's ability to use such Product in Buyer's manufacturing operations for solar applications; or, in the case of Seller only, a default of a Seller supplier beyond Seller's reasonable control (in each case, a "Force Majeure Event"). In the event of any such delay or failure of performance by Buyer or Seller, the other party shall remain responsible for any obligations that have accrued to it but have not been performed by it as of the date of the Force Majeure Event. When the party suffering from the Force Majeure Event is able to resume performance, the other party shall resume its obligations hereunder. The Term of this Agreement may be extended for a period not to exceed three (3) years so as to complete the purchase and delivery of Product affected by a Force Majeure Event. The party suffering a Force Majeure Event shall provide the other party with prompt written notice of (i) the occurrence of the Force Majeure Event, (ii) the date such party reasonably anticipates resuming performance under this Agreement and, if applicable, (iii) such party's request to extend the Term of this Agreement.

In addition, if due to a Force Majeure Event or any other cause, Seller is unable to supply sufficient goods to meet all demands from customers and internal uses, Seller shall have the right to allocate supply among its customers in any manner in which Seller, in its sole discretion, may determine.

Plaintiff alleges that after Agreement IV was executed, the Chinese government embarked on a plan to become the world leader in the solar industry. To that end, the Chinese government provided illegal subsidies to Chinese companies, some of which are state owned. Plaintiff further alleges that the Chinese engaged in "large-scale dumping," i.e., "where a foreign producer aided by state support sells a product at a price that is lower than its cost of production to manipulate an industry and capture market share." As a result, plaintiff contends that China gained 75% of the global solar panel market, causing over 20 United States and European manufacturers to go out of business and solar panel prices to "decline[ ] precipitously." In 2012, plaintiff asserts, the United States imposed anti-subsidy and anti-dumping import tariffs on Chinese-manufactured components of solar panels.

According to plaintiff, the President and CEO of defendant's majority shareholder, Dow Corning Corporation, issued a response to the tariffs, hoping that the United States and Chinese governments would reach an acceptable compromise to stabilize the industry. However, defendant announced layoffs in January 2013 and reduced production because of the trade problems with China.

Plaintiff alleges that as a result of China's market interference, the price of polysilicon to which the parties agreed in 2008 is significantly higher than the market price as of 2015. Consequently, plaintiff maintains, defendant has reduced its participation in the solar market and focused on enforcing its long-term contract, in many cases accepting cash settlements without

having to provide polysilicon, which has caused defendant to remain profitable despite the United States and China's lack of progress toward resolution of the dispute.

In 2011 and 2012, the parties agreed to a series of amendments to Agreement IV, lowering the gross price and applying advance payments to shipments in 2011 and 2012. However, the gross prices from 2013 to 2020 were left unchanged. Plaintiff claims that defendant did not follow through with its additional proposal to amend the long-term pricing to a figure that would be based on market conditions.[1] Plaintiff alleges that after the 2011 and 2012 amendments were signed, defendant's management team changed, and defendant began a strategy of abandoning long-term contracts by refusing amendments to the contracts and keeping its customers' advance payments while charging them double the market prices, resulting in defendant's invocation of the acceleration clauses of the long-term contracts, lawsuits, and settlements. By 2014, defendant insisted that there would be no further amendments to Agreement IV. Plaintiff alleges that in December 2014, after the United States imposed further "anti-dumping duties" on Chinese solar panels and cells, defendant's Tennessee plant was permanently closed due to the "market adversity."

On February 2, 2015, plaintiff sent notice to defendant that it would be exercising its right under the force majeure clause of Agreement IV to discontinue its contractual obligations because of the actions of the Chinese government. On February 13, 2015, plaintiff filed a complaint for declaratory judgment, seeking a declaration that the acts of the Chinese or United States governments constitute a force majeure event under Agreement IV, and that it is not liable for delays or failures to perform for so long as the force majeure event continues. On March 6, 2015, defendant filed a motion for summary disposition under MCR 2.116(C)(8), alleging that plaintiff had failed to state a claim upon which relief could be granted because the force majeure clause does not apply to changes in financial conditions and no governmental act prevented plaintiff from performing under Agreement IV.

After lengthy oral arguments and supplemental briefing, the trial court granted defendant's motion, holding that the unambiguous language of the force majeure clause indicated that even if the acts of the Chinese or United States governments constituted a force majeure event under the contract, economic hardship caused by market conditions "simply is not sufficient to invoke force majeure," particularly in the context of a take-or-pay contract, and that the force majeure clause in the parties' contract "does not provide [plaintiff] any potential relief from its obligation to pay merely because the contract price is no longer financially advantageous.".

This appeal followed.

III. STANDARD OF REVIEW

---

[1] Plaintiff points to no authority that would obligate defendant to amend the contracted-for long-term pricing, nor are we aware of any.

We review a trial court's grant of summary disposition de novo. *Spiek v Mich Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). "MCR 2.116(C)(8) tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted." *Spiek*; 456 Mich at 337; MCR 2.116(G)(5). "A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999) (citation and internal quotation marks omitted). "All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Id*. However, unsupported statements of legal conclusions are insufficient to state a cause of action. *ETT Ambulance Serv Corp v Rockford Ambulance, Inc*, 204 Mich App 392, 395; 516 NW2d 498 (1994).

The interpretation of contractual language, as well as the determination of whether that contract language is ambiguous, is a question of law that we review de novo. *Rossow v Brentwood Farms Dev, Inc*, 251 Mich App 652, 658; 651 NW2d 458 (2002); *Mahnick v Bell Co*, 256 Mich App 154, 159; 662 NW2d 830 (2003).

## IV. ANALYSIS

Plaintiff argues that the trial court erred by determining that the unambiguous language of the force majeure clause compelled the conclusion that plaintiff had not adequately pleaded that it was unable to perform under the contract so as to trigger the protections of the force majeure clause. That is, plaintiff contends that it adequately pleaded, according to the terms of the force majeure clause, that its "delays or failure in performance of its obligations under [the] Agreement" (i.e., its expressed inability to pay) "ar[o]se out of or result[ed] from … acts of the [Chinese] Government," such that its performance should be excused. We disagree.

This Court's "main goal in the interpretation of contracts is to honor the intent of the parties." *Mahnick*, 256 Mich App at 158-159. The words used in the contract are the best evidence the parties' intent. *Id*. at 159, citing *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 491; 579 NW2d 411 (1998). "When contract language is clear, unambiguous, and has a definite meaning, courts do not have the ability to write a different contract for the parties, or to consider extrinsic testimony to determine the parties' intent." *Id*. (citation omitted).

The relevant language of the force majeure clause is as follows: "Neither Buyer nor Seller shall be liable for delays or failures in performance of its obligations under this Agreement that arise out of or result from causes beyond such party's control, including without limitation: . . . acts of the Government . . . ." This Court has observed that there is a paucity of cases interpreting force majeure clauses in Michigan law, see *Erickson*, 189 Mich App at 686, and that remains the case today. However, our general rules of contract interpretation, such as the rule that terms used in a contract are to be given their commonly used meanings unless defined in the contract, apply to the interpretation of force majeure clauses. See *Group Ins Co v Czopek*, 440 Mich 590, 596; 489 NW2d 444 (1992). Further, contracts must be read as a whole. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292; 778 NW2d 275 (2009). Force majeure clauses are typically narrowly construed, such that the clause "will generally only excuse a party's nonperformance if the event that caused the party's nonperformance is

specifically identified." *In re Cablevision Consumer Litigation*, 864 F Supp 2d 258, 264 (ED NY, 2012), citing *Reade v Stoneybrook Realty, LLC*, 63 AD3d 433, 434; 882 NYS2d 8 (2009); see also *Great Lakes Gas Transmission Ltd Partnership v Essar Steel Minnesota, LLC*, 871 F Supp 2d 843, 854 (D Minn, 2012).[2]

In this case, the trial court assumed[3] that plaintiff had adequately pleaded that the actions of China or the United States in the solar industry market generally constituted "acts of the Government."[4] Plaintiff argues, however, that the trial court erred by determining that plaintiff had not adequately pleaded that its delays or failure in performance under the contract had arisen out of or resulted from the "acts of the Government." We disagree.

At the outset, we note that the bulk of plaintiff's complaint for declaratory relief consists of allegations of bad behavior on the part of defendant. Such conduct, even if true, cannot form the basis for relief under the force majeure clause, as none of the alleged acts are "acts of God; acts of the Government or the public enemy; natural disasters; fire; flood; epidemics; quarantine restrictions; strikes; freight embargoes; war; acts of terrorism; [or] equipment breakage."

Further, and while we appreciate the indulgence granted by the trial court in assuming the occurrence of a force majeure event, we hold that the conduct alleged in this case did not constitute a force majeure event under the parties' contract, and that the trial court should have,

---

[2] Cases from other jurisdictions, although not binding on this Court, may be persuasive. *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006). Michigan courts have turned to other jurisdictions for guidance in the interpretation of force majeure clauses. See *Erickson*, 189 Mich App at 698.

[3] Plaintiff argues that the trial court "correctly found that [plaintiff] had alleged force majeure events . . .." That description is inaccurate. The trial court merely *assumed* a force majeure event, and instead focused its analysis on "whether the alleged effect (i.e. financial hardship) of the assumed force majeure event (i.e., acts of the Government) renders [plaintiff] unable to perform its obligations under the Agreement."

[4] We note that the contractual force majeure clause in this case used the term "acts of the Government." That is, it referred to "the" Government, and it capitalized the word "Government" without defining the term. This is in contrast to the force majeure clauses at issue in some of the cited cases, some of which use arguably broader terminology, such as "acts or restraints of any government or governmental body or authority, civil or military," *ANR Pipeline Co v Devon Energy Corp*, unpublished opinion of the Western District of Michigan of the United States District Court, issued February 1, 1989 (Docket No. G86-1123 CA), p 2, or "any action by governmental authority, including ecological authorities," *Sharon Steel Corp v Jewell Coal and Coke Co*, 735 F 2d 775, 777 n 2 (CA 3, 1984). Given our disposition of this appeal, however, we need not decide the meaning of the undefined yet capitalized term, "Government," or whether the term, " ' the' Government" refers to the United States Government or the government of the State of Michigan (whose law applies to the contract), whether it also includes the government(s) of plaintiff's location (Japan), or whether, though unspecified, it potentially includes all governments at any level throughout the world (including China).

had it considered the issue, granted summary disposition to defendant on that additional ground. Regardless, however, of whether we analyze whether a force majeure event occurred, or whether plaintiff's alleged inability to perform its contractual obligations arose out of or resulted from an assumed force majeure event, our holding is the same: plaintiff failed to state a claim on which relief could be granted, and the trial court properly granted summary disposition to defendant. We will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs. *Washburn v Michailoff*, 240 Mich App 669, 678 n 6; 613 NW2d 405 (2000).

Plaintiff argues that, due to the effect of the "trade war" in the solar industry market, it can no longer pay defendant the prices that the parties negotiated" in Agreement IV, and would be forced to leave the solar panel industry if it remained liable under the contract. But these allegations are conclusory and unsupported by allegations of fact. See *ETT Ambulance Serv Corp*, 204 Mich App at 395. Specifically, even taking plaintiff's factual allegations as true and construing them in plaintiff's favor, the allegations of the complaint only indicate that the deflation of the market price for polysilicon has rendered plaintiff's contract with defendant unprofitable. The risk of such a deflation of market prices—no matter the cause—was expressly assumed by plaintiff in its take-or-pay contract with defendant. Plaintiff opted not to protect itself with a contractual limitation on the degree of market price risk that it would assume. It cannot now, by judicial action, manufacture a contractual limitation that it may in hindsight desire, by broadly interpreting the force majeure clause to say something that it does not.

Rather, construing the force majeure clause narrowly, as we must, *In re Cablevision Consumer Litigation*, 864 F Supp 2d at 264, the conduct at issue simply does not constitute a force majeure event. Plaintiff does not allege any "act[] of the Government" that directly prevented its performance under the contract. It merely alleges that the depression of prices in the solar panel market caused performance by plaintiff to become unprofitable or unsustainable as a business strategy. But plaintiff did not (although it again could have) negotiate a contractual force majeure clause that by its terms would have excused contractual performance resulting from unprofitability due to governmental market manipulation. Having failed to do so, plaintiff cannot now, through judicial action, effectively reform the contract to say that for which it opted not to negotiate as part of its contract with defendant.

A similar argument to plaintiff's was presented to, and rejected by, the Fourth Circuit Court of Appeals in *Langham-Hill Petroleum Inc v Southern Fuels Co*, 813 F2d 1327 (CA 4, 1987). In *Langham-Hill Petroleum*, the defendant argued that action taken by Saudi Arabia, "which led to a dramatic drop in world oil prices, falls within the scope of the contract's force majeure or Act of God clause," and excused the party's failure to perform under the contract. 813 F2d at 1328. The court rejected that argument, holding as a matter of law that summary disposition in favor of the non-breaching party was proper because a "[s]hortage of cash or inability to buy at a remunerative price cannot be regarded as a contingency beyond the seller's control." *Id*. at 1330 (citation and internal quotation mark omitted). The court further reasoned that "[i]f fixed-price contracts can be avoided due to fluctuations in price, then the entire purpose of fixed-price contracts, which is to protect both the buyer and the seller from the risks of the market, is defeated." *Id*.

Further, allowing a force majeure clause to provide a party with relief from an unprofitable market downturn would defeat the purpose of a take-or-pay contract, under which a party (in this case, plaintiff) obligates itself to purchase a set amount of a product at a set price per year, or pay the other party the difference between the amount of product it purchases and the contractual amount. "The very reason for entering the take-or-pay contract [is] to insure payment to the producer in the event of substantial change in the marketplace." *Day v Tenneco, Inc*, 696 F Supp 233, 236 (SD Miss, 1988). In this case, Agreement IV states that "Buyer is absolutely and irrevocably required to pay the Net Price per kilogram for the Contract Quantity per calendar year over the Term of this Agreement." Thus, reading the contract as a whole, *Hastings Mut Ins*, 286 Mich App at 292, applying the force majeure clause to excuse plaintiff's obligation to pay pursuant to the contract's take-or-pay provision would "nullify a central term of the contract," *Northern Indianan Pub Serv Co v Carbon County Coal Co*, 799 F2d 265, 275 (1986), and relieve plaintiff from the very risk it contracted to assume.

More generally, although in the context of contracts with fixed prices rather than take-or-pay contracts specifically, persuasive authority from other jurisdictions indicates that financial hardship and unprofitability do not constitute the type of delay or failure in performance sufficient to warrant relief under a force majeure clause. See, e.g., *Great Lakes Gas Transmission Ltd Partnership*, 871 F Supp 2d at 854 (noting that, reading the contract at issue as a whole, the defendant "fails to connect its invocation of the force majeure contract directly with the terms of the Contract" when it alleged that it could not pay under the contract due to economic downturn); *Flathead-Michigan I, LLC v Peninsula Dev, LLC*, unpublished order of the Eastern District of Michigan of the United States District Court, issued March 16, 2011 (Docket No. 09-14043) ("The state of the market is one of the things on which the parties are gambling when the contract is made.") (quotation marks and citation omitted); *Seaboard Lumber Co v United States*, 308 F3d 1283, 1293 (CA Fed, 2002) ("Such acts have only an attenuated effect on the contracts at issue, at most making performance by the timber contractors unprofitable."); *In re Millers Cove Energy Co, Inc*, 62 F3d 155, 158 (CA 6, 1995) (stating that "[c]ourts and commentators generally refuse to excuse lack of compliance with contractual provisions due to economic hardship, unless such a ground is specifically outlined in the contract"); *Coker Int'l, Inc v Burlington Indus, Inc*, 747 F Supp 1168, 1170 (D SC, 1990) ("The force majeure clause applies to objective events which *directly* affect the parties' ability to perform the contract in question, not the ability to make a profit . . . .") (emphasis added); *Langham-Hill Petroleum Inc*, 813 F2d at 1328.

Again, plaintiff does not allege any objective event that directly affected its ability to perform under Agreement IV. It merely alleged market events that allegedly make the contract no longer profitable.

Additionally, plaintiff's reliance on *ANR Pipeline Co v Devon Energy Corp*, unpublished opinion of the Western District of Michigan of the United States District Court, issued February 1, 1989 (Docket No. G86-1123 CA), is misplaced. In *ANR*, the take-or-pay contract at issue contained two inconsistent clauses addressing the force majeure event at issue (the failure of the plaintiff's customers to purchase gas due to the availability of cheaper gas from other sources). *Id*. at pp 2-4. The trial court thus found the contract ambiguous and inappropriate for summary disposition. *Id*. at 4.

In this case, the parties did not argue below that the force majeure clause or any portion of Agreement IV is ambiguous. "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003) (citation omitted). On appeal, plaintiff does not articulate a sufficient basis for this Court to conclude that either a patent or latent ambiguity exists in the contract so as to render summary disposition inappropriate. *Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010) (citations and internal quotation marks omitted). *ANR Pipeline* thus does not aid plaintiff's case. Further, *Sharon Steel Corp v Jewell Coal and Coke Co*, 735 F 2d 775 (CA 3, 1984), while involving a force majeure clause, involved a determination of whether plaintiff's claim of commercial impracticability was arbitrable in light of the strong federal policy favoring arbitration. *Sharon Steel*, 735 F2d at 779. The *Sharon Steel* court's decision that the plaintiff's claim was arbitrable despite the trial court's holding that a drop in market price would not trigger the contract's force majeure clause does not aid plaintiff here in light of the substantially different analysis performed in that case. See *id*. at 779. We thus conclude that authority from other jurisdictions supports our conclusion that the trial court did not err in granting summary disposition to defendant.

Notwithstanding the above analysis, plaintiff argues that the parties did not foresee the alleged illegality of the Chinese government's conduct. Plaintiff relies on *Chang v PacifiCorp*, 157 P3d 243 (Or Ct App, 2007), and *Cartan Tours Inc v ESA Services, Inc*, 833 So 2d 873 (Fla Dist App, 2003). *Chang* involved the common-law doctrine of frustration of purpose, not the interpretation of a contract clause or the application of force majeure clause interpretation principles. *Chang*, 157 P3d at 257-258. Although plaintiff makes much of the trial court's statement in *Chang* that "intelligent and informed executives of these corporations" could not reasonably be expected to anticipate "unlawful activity or activity that is so highly manipulative that it totally distorts the market by the use of false or misleading practices," that statement was made in the context of plaintiff's assertion of the defense of frustration of purpose, an essential element of which is the occurrence of an unforeseeable event. See *id*. at 248, citing Restatement Contracts, 2d (1981) § 265. *Cartan Tours*, 833 So 2d at 874, *involved* the interpretation of a force majeure clause, but did not discuss the foreseeability of illegal activity; rather the *Cartan Tours* court was simply tasked with determining whether an act of "terrorism" interfered with "the ability of the Olympic Games to be held."

Plaintiff further distinguishes *Langham-Hill Petroleum Inc*, 813 F2d at 1328-1329 on foreseeability grounds, arguing that it was foreseeable that Saudi Arabia could affect the global oil market.[5] The *Langham-Hill* court did not base its conclusion on the foreseeability of Saudi Arabia's conduct, nor limit its holding based on such foreseeability. *Id*. at 1330. Nor has plaintiff provided this Court with any other authority in which a court based the applicability of a force majeure clause on the foreseeability of a government action.

---

[5] Plaintiff also argues that a force majeure event need not be foreseeable, thereby undermining its own effort to distinguish *Langham-Hill*.

Plaintiff has thus not provided this Court with any authority, and this Court has found none, that indicates that the unforeseeability of an "act of the Government" or other force majeure event, is an essential element of a claim under a force majeure clause. Although by its plain language, the force majeure event must be outside the parties' control, nothing in the language indicates that the event must be unforeseeable.

More importantly, our decision does not rest on foreseeability grounds, but on interpretation of the contract and the risks assumed by both parties. Certainly, the general notion that markets are volatile and prices may rise and fall was known to both parties and such risk was precisely allocated by the take-or-pay nature of Agreement IV. Agreement IV recites, and plaintiff does not challenge, that the parties to the agreement were sophisticated business entities with equal bargaining power; thus, if plaintiff had wished to protect itself from artificial market deflation due to government action (or, for that matter, excessive market downturns of any kind), it could have done so. Simply put, plaintiff has failed to allege a cognizable claim that a force majeure event occurred, or that a force majeure event caused a delay or failure in performance under the contract.

Finally, plaintiff argues that at a minimum its case should be allowed to proceed to discovery, so that the issue of the foreseeability of China's alleged illegal actions in the solar market and the parties' intent with regard to allocation of risk could be explored. However, as stated above, plaintiff did not argue below, and does not support an argument before this Court, that the contract was ambiguous. Absent ambiguity, interpretation of a contract clause does not require parol or extrinsic evidence to resolve. See *Shay v Aldrich*, 487 Mich 648, 667-668; 790 NW2d 629 (2010). Although plaintiff points out that several of the cases from other jurisdictions were not resolved at the pleading stage, *Great Lakes Gas Transmission Ltd Partnership*, 871 F Supp 2d at 862, applying Michigan law, was decided on the pleadings. Further we do not discern from the procedural posture of the cases cited by plaintiff a rule that cases involving the interpretation of force majeure clauses, even ones that involve allegedly illegal government action, are immune from dismissal under MCR 2.116(C)(8).

Thus, construing the force majeure clause narrowly, *In re Cablevision Consumer Litigation*, 864 F Supp 2d at 264, we conclude that plaintiff has failed to allege a force majeure event, or a cognizable delay or failure to perform arising from a force majeure event, within the meaning of, and so as to trigger the protections of, the force majeure clause contained in the parties' contract. Rather, plaintiff has merely pleaded unprofitability, due to the deflation of market prices, the risk of which it expressly assumed. Plaintiff has thus failed to plead a claim on which relief can be granted. MCR 2.116(C)(8); *ETT Ambulance Serv Corp*, 204 Mich App at 395.

Affirmed.

/s/ Mark T. Boonstra
/s/ Henry William Saad
/s/ Joel P. Hoekstra