*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SCOT SWAN,

        Plaintiff/Counterdefendant-
        Appellant,

v

SHERRIFF-GOSLIN COMPANY, ROBERT C.
SHERRIFF, WILLIAM TICKNOR, and
STEPHEN TICKNOR

        Defendants/Counterplaintiffs-
        Appellees.

UNPUBLISHED
January 23, 2020

No. 344597
Calhoun Circuit Court
LC No. 2016-002779-CK

Before: CAMERON, P.J., and SHAPIRO and SWARTZLE, JJ.

PER CURIAM.

In this employment action, plaintiff challenges on appeal the trial court's rulings granting defendants summary disposition of his claims for breach of contract, promissory estoppel, and wrongful termination pursuant to MCR 2.116(C)(10). We affirm.

## I. BACKGROUND

Defendant Sherriff-Goslin Company (SG) is a roofing and siding company with multiple branches in Michigan, Ohio, and Indiana. Defendant William Ticknor ("Ticknor") is SG's chairman. Defendant Robert C. Sherriff ("Sherriff") is SG's president. Defendant Stephen Ticknor is SG's treasurer and vice president. Plaintiff began employment with SG as a salesman in Indiana in 1982. He was later promoted to branch manager in Dayton, Ohio, and on January 1, 2015, became a "branch operations trainer," a position he occupied until his termination on June 15, 2016. At issue in this appeal is whether plaintiff is entitled to compensation for the yearly bonus 1% Manager Training Pay ("1% MTP") he had been earning before his discharge, and whether plaintiff was an at-will employee or could be fired only for just cause. The trial court granted summary disposition in favor of defendants with respect to both issues.

## II. BREACH OF CONTRACT

Plaintiff first argues that the trial court erroneously ruled that there was no genuine issue of material fact regarding his entitlement to continued 1% MTP payments after his discharge from employment. We disagree.[1]

A court's goal in interpreting a contract is to give effect to the intent of the parties, and "[t]he words used in the contract are the best evidence the parties' intent." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 446; 886 NW2d 445 (2015). However,

> [c]ourts seek to find a fair reading of contract language—not a strict one—because strict constructionism destabilizes the whole enterprise of contract law. Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 39-41 and 355-358. Brittle, hyperliteral interpretations make agreements fragile and impractical. [*Thiel v Goyings*, ___ Mich ___, ___; ___ NW2d ___ (2019) (Docket No. 156708); slip op at 13.]

In addition, "[w]ords should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the [agreement] as a whole." *Id*. at ___; slip op at 14 (quotations and citations omitted). "[W]here a term is not defined in a contract, we will interpret such term in accordance with its commonly used meaning." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 215; 737 NW2d 670 (2007). "In determining what a typical layperson would understand a particular term to mean, it is customary to turn to dictionary definitions." *Drouillard v American Alternative Ins Corp*, 504 Mich 919; 929 NW2d 777 (2019).

The basis for the 1% MTP payments was a 1980 company bulletin in which the company's then president, Fred Sherriff, offered the compensation as an incentive for branch managers to train salespeople to become branch managers. The bulletin, which was created by Lansing Branch Manager Ed Hieftje III at Fred Sherriff's instruction, stated, in pertinent part:

> Getting paid for training Managers
>
> I have talked to 3 Managers in the last week and all 3 did not understand how they get paid if they train and put out a new Manager. He will receive 1% on the total volume of the new Managers volume each year. *This will go on even*

---

[1] We review a trial court's decision on a motion for summary disposition de novo. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013). In reviewing a motion brought under MCR 2.116(C)(10), we consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party. *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). "Similarly, whether contract language is ambiguous is a question of law that we review de novo," and "the proper interpretation of a contract is also a question of law that we review de novo." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

*after you retire* as long as the new Manager stays employed by us. I don't think a lot of our Managers know the significance of this in the amount of money it can put in our pockets. We need new men and Mr. Sherriff is paying big bucks for hiring and training. More on this in the coming months. If there are any questions, call me and I'll be glad to explain. [Emphasis added.]

The parties agree that the 1% MTP was made a company-wide policy in order to provide a training incentive for branch managers, such as plaintiff, in return for the loss of other compensation the managers would otherwise receive from sales made by trainees. Hiefjte referred other managers to the bulletin and it was subsequently included in a binder of bulletins and information that was given to every branch manager in the company. Plaintiff acknowledged that he received the bulletin in his binder and read it during his first week as the Dayton manager in 1983.

SG stopped paying the 1% MTP to plaintiff after his discharge. Plaintiff brought this action, alleging claims for breach of contract and promissory estoppel. After discovery, the trial court found that the parties' agreement did not provide for continued payment, and the court granted defendants' motion for summary disposition with respect to plaintiff's breach-of-contract and promissory estoppel claims. The trial court reasoned that plaintiff did not qualify for continued payment of the 1% MTP because he did not retire but rather was discharged.

"It is well settled under Michigan law that an employer's statement of policy contained in a manual or handbook can give rise to contractual obligations in certain circumstances." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 213; 933 NW2d 363 (2019). Defendants concede that the bulletin explaining the %1 MTP conferred a contractual benefit to branch managers. Plaintiff argues that there is an implied-in-fact contract regarding the 1% MTP. "Courts, however, may not imply a contract if the parties have an express contract covering the same subject matter." *AFT Mich v Michigan*, 303 Mich App 651, 660; 846 NW2d 583 (2014). Accordingly, the bulletin describing the 1% MTP policy controls this dispute.

The only post-employment benefit contemplated by the bulletin concerns retirement. "Retire" is not defined in the MTP bulletin. The parties argued below whether "retirement" required that an individual either reach the age of 62, or be over 59½ years old and have 30 years of service as set forth in the company's profit sharing plan. However, we need not reach this question given that plaintiff did not voluntarily retire from employment, but instead was involuntarily discharged, i.e., fired.

Retirement is plainly different from being fired. Plaintiff does not argue that he retired or that anyone ever specifically defined "retire"[2] to him in such a manner that would cause him to reasonably believe that he would continue to receive the 1% MTP even if he was discharged. Nor does he allege that SG discharged him to avoid having to pay him that benefit in retirement. Instead, plaintiff suggests that he is still entitled to the continued payments because, had Fred

---

[2] *Merriam-Webster's Collegiate Dictionary* (11th ed) defines "retire," in pertinent part, as "to withdraw from one's position or occupation: conclude one's working or professional career."

Sherriff wanted retirement to be the only way to qualify, he would have used language such as "only if you retire" instead of "even after you retire" when he had Hieftje draft the bulletin. Plaintiff is essentially requesting that we engage in a "[b]rittle, hyperliteral" construction of this portion of the bulletin's phrasing. See *Thiel*, ___ Mich at ___; slip op at 13. We decline to do so.

Even if the bulletin language is not controlling, plaintiff has presented no testimony or other evidence to create a question of fact whether the parties agreed that the 1% MTP was intended to continue for the trainer's life, no matter the circumstances of the trainer's departure from SG. Plaintiff relies on a statement in Hieftje's deposition testimony that the intention was that the training manager would receive the 1% MTP pay for the manager's whole life. However, plaintiff ignores the balance of Hieftje's testimony that "[w]hen you quit . . . you're done with the one percent" and that the 1% MTP would also not continue if the manager was fired. Plaintiff also presented no other evidence in support of his proffered interpretation, such as an example of another manager who continued to receive the 1% MTP after being fired from SG. In contrast, defendants presented the example of another employee who did not continue to receive the 1% MTP after he was fired.

In sum, even when viewed in plaintiff's favor, the evidence supports the trial court's determination that under the agreement outlined in the 1980 bulletin there was no genuine issue of material fact regarding plaintiff's entitlement to continued 1% MTP payments. Accordingly, the trial court did not err by granting defendants' motion for summary disposition with respect to plaintiff's breach-of-contract and promissory estoppel claims.[3]

## III. WRONGFUL TERMINATION

Plaintiff also argues that the trial court erred by dismissing his wrongful-termination claim on the ground that there was no genuine issue of material fact with regard to whether plaintiff could only be discharged for just cause. We disagree.

"Generally, and under Michigan law by presumption, employment relationships are terminable at the will of either party." *Lytle v Malady (On Reh)*, 458 Mich 153, 163; 579 NW2d 906 (1998). Employment contracts for an indefinite period produce a presumption of employment at-will absent distinguishing features to the contrary. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 383; 563 NW2d 23 (1997.) An employee whose employment relationship is at-will can have his employment terminated at any time for any, or no, reason. *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 694-695; 316 NW2d 710 (1982). A promise to terminate only for just cause may overcome the presumption of at-will employment, as can company policies that instill legitimate expectations of job security in employees also may overcome the presumption. *Dolan*, 454 Mich at 383-384. There is a two-step inquiry for evaluating legitimate-expectations claims:

---

[3] Plaintiff does not provide an analysis of the elements of promissory estoppel or the court's dismissal of this claim and argues only that the parties had a contract that defendants breached. Accordingly, he has abandoned this claim on appeal. See *Innovation Ventures v Liquid Mfr*, 499 Mich 491, 518-519; 885 NW2d 861 (2016).

The first step is to decide "what, if anything, the employer has promised," and the second requires a determination of whether that promise is "reasonably capable of instilling a legitimate expectation of just-cause employment . . . ." [*Lytle*, 458 Mich at 164-165, quoting *Rood v Gen Dynamics Corp*, 444 Mich 107, 138-139; 507 NW2d 591 (1993).]

In this case, different versions of SG's employee handbook contained specific language providing for at-will employment. For example, the 1998 handbook provided:

**EMPLOYMENT AGREEMENT**

I recognize that my employment with Sheriff-Goslin is "at will" and may be terminated either by myself or the Company at any time, with or without notice and with or without cause. No modifications may be made to my "at will" employment unless the specific terms are authorized in writing by the Chairman and/or President of the Company.

The 2015 version of the handbook contains substantially similar language. Defendants submitted documents showing that plaintiff was fully aware of these provisions.

In *Lytle*, the Supreme Court held that a claim of just-cause employment could not be based on a statement in the employer's handbook that "[n]o employee will be terminated without proper cause or reason and not until management has made a careful review of the facts." *Lytle*, 458 Mich at 166. The Court found that this language was insufficient to overcome the strong presumption of at-will employment, particularly where the handbook provided that none of its contents were intended to establish a contract between the employer and employees. *Id*. Given *Lytle*, plaintiff cannot maintain a legitimate-expectations claim. The handbook clearly sets out SG's policy of at-will employment. The handbook also provides that any contract for just-cause employment must be set out in writing and signed by either the president (Sherriff) or the chairman (William Ticknor). Plaintiff has not shown that any such just-cause writing exists with respect to his employment.

In addition, plaintiff fails to provide extrinsic evidence that would create a question of fact whether he had a legitimate expectation of just-cause employment. In their depositions, Sherriff and Ticknor both acknowledged that the official company policy was at-will employment. Sherriff specifically testified that it was in his or Ticknor's discretion whether to use the at-will provision when deciding whether to discharge an employee. Despite the acknowledgments by Sherriff or Ticknor that they preferred to fire employees only when there was a good reason to do so, their contractual commitment to their employees did not extent beyond a promise of at-will employment and so they were not legally required to prove just cause in the event of a termination. Their statements that they would need a "good reason" to fire an employee or wanted to treat their employees fairly is not a "clear" statement as to what is being promised. See *Lytle*, 458 Mich at 164. And although Sherriff and Ticknor maintained that they had not yet fired an employee without good reason, and they did not intend to do so, this did

not give rise to a reasonably legitimate expectation that they could not do so, particularly in light of the at-will provisions in the written handbook.[4]

For these reasons, the trial court did not err when it granted summary disposition in favor of defendants with respect to plaintiff's wrongful discharge claim.

Affirmed.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Brock A. Swartzle

---

[4] Plaintiff was fired from SG on June 15, 2016, amid allegations that he had misappropriated rebates from SG's suppliers.