*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KIMBERLY SMITH KEESSEN,

Plaintiff-Appellant,

UNPUBLISHED
January 26, 2023

v

JAY CHRISTOPHER KEESSEN,

Defendant-Appellee.

No. 359074
Muskegon Circuit Court
LC No. 18-002698-DM

Before: GLEICHER, C.J., and MARKEY and RICK, JJ.

PER CURIAM.

Plaintiff, Kimberley Keessen, and defendant, Jay Keessen, were married in 2004, and their marriage was dissolved by a judgment of divorce (JOD) in 2021. Plaintiff appeals of right the JOD, raising issues related to the calculation of defendant's income, the trial court's award of credits to defendant for payments allegedly made during a status quo period, and the division of receivership fees. Finding no error requiring reversal, we affirm the trial court's entry of the JOD.

## I. PERTINENT FACTS AND PROCEEDINGS

Plaintiff is an audiologist who owns and operates Shoreline Hearing Center (SHC). Defendant owns and operates Keessen Agency, an insurance agency, and he manages the parties' numerous rental properties. The individual properties are grouped into five businesses, three of which defendant co-owns with third parties.

Plaintiff filed a complaint for divorce on May 25, 2018. In July, the trial court entered an ex parte conciliation order that required the parties, among other things, to maintain the financial status quo regarding the payment of debts and the operation of the household until further order of the court. Almost immediately, each party accused the other of violating the status quo order. In December 2018, the trial court revoked the status quo order, required the parties to maintain separate finances beginning with the next billing cycle of each expense, and provided that the parties could argue at trial any claims for offsets arising during the period when the status quo order was in place. The court later amended the order to require defendant to pay the property tax bill for SHC and to pay plaintiff a to-be-determined prorated credit for his use of the SHC building.

-1-

In a stipulated order signed by the trial court in April 2019, the court appointed Amicus Management as receiver over the parties' real property interests. The court authorized the receiver to identify the receivership property, obtain financial information related to the property, and quantify the marital estate. The parties and their agents were directed to cooperate with the receiver and to turn over any material in their possession that was requested under the authority of the order. Each party was responsible for half of the receiver's fees, and the receiver was responsible for submitting periodic reports to the parties.

The divorce was highly contentious. The parties strongly disagreed about how to treat income from the rental properties and about the sharing of financial information. Defendant believed that the rental property business was his primary business and that all income generated by the rental properties was his separate property. Defendant also insisted that the trial court set May 25, 2018, as the valuation date for the properties. Accordingly, he was unwilling to provide the receiver with any financial information about the properties dated after May 25. Plaintiff believed that her primary business was SHC, that defendant's primary business was the insurance agency, that the rental businesses and the income they generated were marital assets, and that the rental properties should be appraised at current market value.

Both the receiver and plaintiff moved the trial court for a valuation date. Plaintiff alleged that defendant misrepresented to the receiver that rental income generated after May 25 was "off the table" because the trial court had ruled that it was his separate property. Plaintiff also alleged that defendant's counsel instructed the appraiser to value the rental properties as of May 25, 2018, and to exclude any personal property in the rentals. Plaintiff further alleged that defendant had accompanied the appraiser to the appraisals. Additionally, plaintiff alleged that the appraiser believed that defendant's counsel was his client and continued appraising the properties in accordance with defendant's counsel's instructions, even after plaintiff's counsel instructed the appraiser otherwise. Plaintiff asserted that the properties that had already been appraised would have to be reappraised, and she argued that defendant should solely bear the costs of the second appraisals.

In an order entered in October 2019, the trial court found as a matter of fact that the income generated by the rental property businesses was marital property. The Court ordered defendant to pay plaintiff their "pro rata share of the respective companies' net income on or before the tenth of each month" until entry of a JOD.

In July 2020, the parties memorialized their agreement with respect to the division of their business interests, their bank and investment accounts, certain other real property, and personal property, assets, and liabilities. Relevant to the instant appeal, the mediation agreement called for defendant to pay plaintiff $850,000. The parties agreed to use $110,000 as plaintiff's annual income for purposes of calculating child support and agreed that defendant's income would be determined later. The parties also agreed that distribution of personal property not addressed in the agreement would be submitted to arbitration. Additionally, the parties agreed the receiver's analysis of income sharing related to the rental properties would conclude on July 1, 2020, and that the remaining amounts owed would be determined and paid.

A three-day trial began in August 2020. The receiver offered testimony regarding the computation of net income to determine plaintiff's monthly share of the net rental income from

the rental property businesses while the divorce was pending. The receiver explained that the net income from the rental properties could not be calculated by simply looking at the rental income received because debt reduction is treated as income, thereby inflating "net income" in comparison to cash flow. Consequently, the receiver calculated net income from the rental property businesses by deducting defendant's management fee of 10% of gross income from those rental property businesses wholly owned by the parties and 5% of gross income from those rental property businesses that the parties co-owned with others from distributions that defendant received.[1] According to the receiver, the management fee was an accounting fiction designed to compensate defendant for his management of the properties, but none of the businesses were actually charged an actual management fee. The receiver determined that after deduction of the management fee from the distribution, plaintiff's half of the distributions was $154,325.[2] Defendant had paid $104,834 and, after plaintiff's taxes were subtracted, defendant owed plaintiff $26,949. The receiver also explained that if he had calculated a 10% management fee hypothetically paid by all of the rental property businesses, and not just those that wholly owned by the parties, defendant would have earned $234,612 over two years, resulting in an average annual income from management fees of $112,000.

Plaintiff's expert in forensic accounting, business valuation, fair market value, and income analysis, testified regarding the calculation of defendant's income for purposes of child support. The expert testified that adjusted gross income (AGI) could be used "as a proxy" for income available to determine child support because it was a "very quick, rough measure of income for support purposes." He explained that there were drawbacks to using AGI, and he could not recall a case in which he had used AGI for child support purposes. The expert testified that it was important to distinguish between tax-basis income and cash-basis income when considering an individual's child support obligation. He explained that a person could have a million dollars of pass-through taxable income yet receive none of that money in cash. The expert opined that it would be unfair to impute a million dollars in income that might show up in the AGI but never come into the person's hands. With respect to management fees, the expert opined that an annualized management fee of $112,000 should be imputed to defendant going forward. He testified that defendant's average income for 2017 through 2019 computed using defendant's distributions, wages, and other sources of income was $232,000. Adding in management fees of $112,000, defendant's total income would be $344,000.

Defendant's expert in accounting and calculating income for purposes of child support testified that defendant's income for purposes of calculating child support should be based on the

---

[1] The deduction resulted from the trial court's instruction to give defendant a 10% management fee on the gross rental income. At an October 14, 2019 hearing, the receiver testified that a 10% management fee was reasonable and that the management fee likely would not be applied to all businesses equally because some third-party owners contributed sweat equity to the businesses.

[2] The receiver explained that using distributions and treating debt reduction as income increased the parties' equity in the properties. This equity could be divided during the final settlement of the assets.

$222,000^3$ estimation of defendant's 2019 income from plaintiff's expert's analysis. The expert testified that because no management fees were deducted from the total distributions reflected in defendant's income, the fees could not be "added back" or imputed to defendant because "that would be a double count of this income." The expert explained that "if those management fees had been paid, the distributions or income noted in all the calculations . . . would have been lower."

Defendant asked the trial court for credits for payments he allegedly made during the period when the status quo order was in place, arguing that the parties' mediation agreement did not foreclose his request for such credits. Plaintiff, on the other hand, testified that she understood the parties' settlement agreement to have resolved all matters involving property and debt. The parties made their closing arguments in writing. In addition to reiterating arguments made throughout the litigation, plaintiff argued that the trial court should order defendant to pay 100% of the receivership costs, including the cost of the receiver's attorney, as well as attorney fees for a trial that was frivolous and harassing.

The trial court delivered its opinion in June 2021. As pertinent to this appeal, the trial court found that the mediation settlement did not state that it was a final settlement or that it resolved all the issues. The court also observed that a March 2019 order reserved the issue of credits. Determining that it was going to honor the 2019 order, the court awarded defendant credits totaling $34,871.22. Subtracting the amount that defendant still owed plaintiff in rental income resulted in plaintiff owing defendant $7,221.22. The trial court concluded that it would use $222,000 as defendant's income for purposes of calculating child support moving forward, reasoning that plaintiff's expert provided the figure as an average income and that defendant's expert agreed with the figure.[4] The court found that "the cash basis income is more representative of what the defendant actually has available to pay as support and the experts agree on that number." Plaintiff now appeals.

## II. ANALYSIS

### A. IMPUTATION OF INCOME

Plaintiff argues that the trial court erred by not imputing to defendant the income from management fees that he could have earned from those businesses co-owned by business partners. Plaintiff contends that under the Michigan Child Support Formula, a parent's income includes any

---

[3] Defendant's expert recognized that plaintiff's expert calculated defendant's average income from 2017 through 2019 to be $232,000. Defendant's expert opined that plaintiff's expert's calculation of defendant's income for 2019 at $222,000 was a more "accurate representation" of defendant's income moving forward.

[4] This was incorrect. Plaintiff's expert testified that defendant's average income for 2017 through 2019 was $232,000. The expert testified that defendant's income for 2019 was $222,000. Plaintiff did not argue in the trial court, and does not argue on appeal, that the trial court erred by adopting $222,000, rather than $232,000, as defendant's income.

potential income that the parent could earn.[5]  Plaintiff contends that the trial court allowed defendant to collect a 10% management fee from the rental property businesses' gross income, but a management fee of only 5% was applied to the gross income of businesses co-owned by third parties.  Plaintiff contends that proper application of the 10% management fee would have increased defendant's annual income by $42,000 for the purpose of calculating child support.  Plaintiff's argument is misplaced.

The trial court's instruction to the receiver to apply a 10% management fee on the gross rental income generated by the rental property businesses was related to the trial court's finding that all income generated from the marital rental property was marital and that plaintiff was entitled to a pro rata share of the businesses' net income until entry of a JOD.  The court's instruction to the receiver to deduct a management fee was not related to a determination of defendant's income for calculating child support.  According to the receiver's testimony, the management fee was an accounting fiction designed to compensate defendant for his management of the properties when dividing the income from the rental property businesses.  Plaintiff argued at an October 14, 2019 motion hearing that the management fee applied to businesses co-owned by third parties should be half of that applied to the businesses wholly owned by the parties.  Plaintiff's counsel prepared an order incorporating this position, and the receiver applied the management fee in this fashion.  By expressly agreeing to this method of calculating defendant's management fee, plaintiff waived for appellate review the argument that a 10% management fee should have been applied to businesses co-owned by third parties.  See *Hodge v Parks*, 303 Mich App 552, 556; 844 NW2d 189 (2014).

Nevertheless, the trial court's ruling did not expressly address imputing to defendant income from management fees for any of the rental property businesses, regardless of whether the businesses were co-owned with third parties.  Rather, the court accepted the testimony from the experts that defendant's income should be determined to be $222,000.[6]  Testimony was presented that the distributions defendant received from the businesses were income.  Management fees were not deducted as a business expense from the distributions.  Defendant's expert testified that it would not be appropriate to impute additional income to defendant for management fees that he effectively received in his distributions.  In other words, because the businesses did not deduct management fees as a business expense before making the distributions, defendant essentially received what would have been the purported management fee in his distributions.  It appears clear that the court did not find it appropriate to impute income for management fees to defendant.  We find no merit in plaintiff's suggestion that the court erred by applying only a 5% management fee on co-owned rental business properties as the court did not impute income for management fees

---

[5] Plaintiff also argues that the trial court erred by using a cash-basis methodology instead of an AGI methodology to calculate defendant's income.  Plaintiff did not raise this issue in her statement of the questions presented in her brief on appeal, however, and thereby waived review of the issue on appeal.  See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019).  Nevertheless, we note that neither parties' expert testified that AGI was a proper means of computing income.

[6] As previously noted, this figure did not include any imputed income from management fees.

for the co-owned properties (or any properties) when calculating defendant's income for purposes of child support.

## B. CREDITS

Plaintiff next contends that the trial court erred by determining that the parties' mediation agreement did not foreclose awarding any credits to defendant for payments made and expenses incurred during the status quo period. We disagree.

The mediated property settlement at issue may be construed as a contract. See *MacInnes v MacInnes*, 260 Mich App 280, 283; 677 NW2d 889 (2004) (stating that "[a] settlement agreement, such as a stipulation and property settlement in a divorce, is construed as a contract"). The interpretation of a contract is a question of law subject to de novo review. *Reed v Reed*, 265 Mich App 131, 161-162; 693 NW2d 825 (2005). This Court's "main goal in the interpretation of contracts is to honor the intent of the parties." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 446; 886 NW2d 445 (2015) (quotation marks and citation omitted). The best evidence of the parties' intentions "are the words used in the contract." *Id*. "When contract language is clear, unambiguous, and has a definite meaning, courts do not have the ability to write a different contract for the parties, or to consider extrinsic testimony to determine the parties' intent." *Id*. (quotation marks and citation omitted).

Plaintiff has not pointed to any statement in the mediation agreement that is ambiguous or that supports her position that the mediation agreement barred the parties from pursuing credits for payments allegedly made during the status quo period. The parties agreed to divide their various business entities, banking and investment accounts, and certain other property, and they expressly left open the division of personal property not mentioned in the mediation agreement. However, nothing in the mediation agreement indicates that it constituted a full and final mutual release of all the parties' claims. The trial court's orders of December 11, 2018 and March 20, 2019, stated that the parties could address at trial credits for payments made during the status quo period, and nothing in the language of the mediation agreement supersedes or negates the parties' rights under those orders.

Plaintiff's reliance on *Vittiglio v Vittiglio*, 297 Mich App 391; 824 NW2d 591 (2012), and *Keyser v Keyser*, 182 Mich App 268; 451 NW2d 587 (1990), for support of her position is unavailing. In those cases, this Court held that settlement agreements reached by the parties to a divorce action could not be set aside. *Vittiglio*, 297 Mich App at 399; *Keyser*, 182 Mich App at 271. In the present case, defendant is not seeking to set aside the mediation agreement, and, as already explained, the language of the mediation agreement does not prohibit either party from exercising the right afforded her or him to seek credits for payments made during the status quo period. Therefore, defendant's request for credits is not contrary to the express terms of, nor does it require setting aside, the mediation agreement. Accordingly, the trial court did not err by allowing defendant to seek credits for payments and expenditures made during the status quo period.

## C. RECEIVER'S FEES

Plaintiff next argues that, because defendant's conduct made it necessary for the trial court to appoint a receiver, the trial court erred by not ordering defendant to pay all the receiver fees. We again disagree.

As with attorney's fees, we review a trial court's decision regarding receiver fees for an abuse of discretion. See *Reed*, 265 Mich App at 164. A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes. *Stallworth*, 275 Mich App at 284. The findings of fact upon which a trial court bases an award of receiver's fees are reviewed for clear error, and questions of law are reviewed de novo. See *Reed*, 265 Mich App at 164. A "finding is clearly erroneous if this Court, on all the evidence, is left with a definite and firm conviction that a mistake was made; the appellant bears the burden of showing that a mistake was made." *Beason*, 435 Mich at 805.

"A circuit court has broad jurisdiction to appoint a receiver in an appropriate case." *Reed*, 265 Mich App at 161. In the present case, although the parties contested the need for a receiver, they stipulated to the order appointing Amicus Management as receiver over their real property interests, and they agreed to split the receiver's fees equally and to pay all fees and out-of-pocket expenses within 30 days of a submitted invoice. The factual support for plaintiff's argument that the trial court should have shifted the receiver's fee entirely to defendant comes primarily from comments made at a June 2020 hearing on the receiver's motion to expand the scope of the receivership to allow it to liquidate real property in the marital estate to satisfy fees and expenses and other obligations that defendant had not paid, ostensibly because he lacked the cash.

The hearing illustrated the receiver's belief that defendant delayed in meeting his financial obligations to the receiver and to plaintiff. It was clear that defendant failed to pay the amounts that he owed plaintiff in 2018 and 2019, during which time defendant believed that the income generated from the rental properties was his separate property. Defendant also failed to pay fees owed to the receiver and the receiver's attorney, despite representing on numerous occasions that he would pay overdue invoices. On the positive side of the ledger, the receiver's attorney acknowledged that defendant had cooperated with the receiver by providing requested documents, and the attorney stated that certain problems that existed in 2019 were no longer present in 2020. Further, the transcript indicates that the receiver recognized defendant's cashflow problems and had earlier agreed to the sale of a certain piece of property to provide an injection of cash.

Much of defendant's delay in meeting his financial obligations seems attributable to his position during the first 18 months of the litigation that the marital property was to be valued as of May 25, 2018, and his related refusal to provide the receiver with financial information about the properties that was dated after May 25 and insistence that the revenue from the marital rental properties was his separate property. The trial court sanctioned defendant for this conduct by requiring that defendant pay plaintiff's attorney fees, the receiver fees, and the receiver's counsel's fees attributable to defendant's positions, as well as to personally pay for any reappraisals necessitated by his conduct. Although the receiver and plaintiff were justifiably frustrated with defendant's alleged delay in making payments, the June 2020 motion hearing transcript suggested that earlier issues with the litigation had been resolved and that at least part of defendant's delay in paying his obligations might have been related to legitimate cashflow problems. By the time of

trial, the receiver could testify that defendant had paid plaintiff most of what the receiver had determined that defendant was owed. In addition, despite plaintiff's attorney's reference to the "shell games" that defendant was allegedly playing, defendant's conduct was not such that the trial court deemed it necessary to make any findings that would support shifting the entire receiver's fee to defendant. Viewing the record as a whole, we are not convinced that the trial court abused its discretion by declining to order defendant to pay 100% of the receiver's fees.

## D. CALCULATION OF INCOME

Lastly, plaintiff contends that, although the trial court ordered that she and defendant split the net income from the rental businesses while the divorce was pending, the receiver calculated distributions using a net-distribution model rather than a net income model. Plaintiff argues that the trial court erred by not correcting the receiver. Again, we find no error.

At issue is whether the trial court erred in its factual findings for purposes of income distribution and child support calculations. This Court reviews a trial court's factual findings for clear error. A "finding is clearly erroneous if this Court, on all the evidence, is left with a definite and firm conviction that a mistake was made; the appellant bears the burden of showing that a mistake was made." *Beason*, 435 Mich at 805.

The assumption underlying plaintiff's argument is that the cash-basis methodology that the receiver used did not calculate "net income." The receiver's attorney explained at trial that "net income" was not a defined term, and it could mean different things. The receiver interpreted "net income" in a way that allowed him to identify the monetary benefit that defendant was getting from the properties and to provide an equalizing payment for plaintiff. The primary difference between the income-basis model of calculating distributions and the cash-basis model used by the receiver is that the former treats debt reduction as income but the latter does not. For purposes of distributing rental income, the receiver adopted a cash-basis methodology because the cash associated with debt reduction income went to the bank and, therefore, was not available for distribution to the parties. Both parties potentially benefited from the cash-basis methodology because the "income" realized through debt reduction was "distributed" in the form of an increase in equity shared by the parties as owners of the marital rental properties. This increase in equity was reported in each receiver's report, and was available to factor into the parties' negotiations regarding their real property assets.

Plaintiff has not argued that the cash-basis methodology used by the receiver to calculate rental income distribution was inappropriate, and she conceded at trial through her attorney that the receiver did a great job and that she understood that there was a cash flow issue that had to be managed. Nor has plaintiff argued that the receiver's calculations under the cash-basis methodology were incorrect. Plaintiff's argument is that, according to the receiver, if a net income model had been used instead of a net-distribution model, she would be entitled to an additional $113,497. That another interpretation of "net income" might have resulted in more money for plaintiff does not necessarily mean that the receiver's definition of "net income" was incorrect or that the trial court clearly erred by viewing the receiver's calculation of distributions using a cash-basis methodology as compliant with the trial court's order. On these facts, plaintiff has not shown that the trial court clearly erred by accepting the receiver's definition of "net income."

Affirmed.  As the prevailing party, defendant may tax costs.  MCR 7.219.

/s/ Elizabeth L. Gleicher
/s/ Jane E. Markey
/s/ Michelle M. Rick