*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CENTERPOINT OWNER, LLC,

      Plaintiff-Appellee,

UNPUBLISHED
December 10, 2020

v

PANAGIOTIS GOULAS,

      Defendant-Appellant,

and

PANOS XI FOODS, INC.,

      Defendant.

No. 344762
Kent Circuit Court
LC No. 16-009133-CK

Before: TUKEL, P.J., and MARKEY and GADOLA, JJ.

PER CURIAM.

Defendant, Panagiotis Goulas, appeals as of right the trial court's order granting damages to plaintiff, CenterPoint Owner, LLC. The trial court ordered defendant to pay plaintiff $240,976.97 for the breach of guaranty claim, $131,145.50 for reasonable attorney fees, and $531.92 for costs. The trial court determined that defendant owed plaintiff a total of $372,654.39. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1). For the reasons stated in this opinion, we affirm in part and reverse in part the trial court's findings.

## I. UNDERLYING FACTS

In July 2013, defendant, on behalf of the company Panos XI Foods, entered into a lease for a space at CenterPointe Mall with CenterPointe Partners. Defendant was part owner of Panos. Defendant also signed a personal guaranty for the lease.[1] In June 2014, plaintiff acquired

---

[1] The guaranty was attached as Exhibit G to the lease and, therefore, is part of the lease. Thus, the guaranty is not a separate contract.

-1-

CenterPointe Mall and assumed the leases that CenterPointe Partners had with its tenants at the mall. This included the lease that CenterPointe Partners had with Panos and the guaranty that defendant had with CenterPointe Partners.

In relevant part, the lease provided:

4.09 Late Charge/Interest. Any rent unpaid for more than seven (7) days after such rent is due shall be subject to a late charge of $100.00, and such late charges shall be due from Tenant to Landlord as additional rent on or before the next rental due date. Any default in the payment of rent shall not be considered cured unless and until such late charges are paid by Tenant to Landlord or if Tenant shall default with respect to any other payment due under this Lease, Landlord may, but shall have no obligation to, make such payment for the account of Tenant, in either or both of which event(s) the amount thereof shall be payable as additional rent to Landlord by Tenant on the next rental due date together with interest per annum at the lesser of the maximum allowable legal rate and the prime rate published in The Wall Street Journal, plus two percent (2%) per annum (the "Default Interest") from the date such payment is due to or made by Landlord. On default of payment of such late charges and/or Default Interest, Landlord shall have the same remedies as on default in payment of rent. Such late charges and/or Default Interest shall be in addition to any other rights and remedies Landlord may have as provided by this Lease or as allowed by law.

\* \* \*

17.01 Landlord's Right to Cure Default of Tenant. In the event Tenant shall default in the performance of any covenant or condition of this Lease, Landlord may (without notice to Tenant, if in Landlord's reasonable opinion an emergency exists) perform such covenant or condition for Tenant's account and at the expense of Tenant. Landlord shall be reimbursed by Tenant for any reasonable expense incurred by Landlord (a) in performing such covenant or condition or (b) in instituting, prosecuting or defending any action instituted because of any default of Tenant, including, but not limited to, reasonable attorneys' fees. If Tenant becomes obligated to reimburse Landlord hereunder, such sum shall be considered additional rent and shall be due within thirty (30) days after written notice to Tenant of such expenditure. Should Tenant fail to make such reimbursement when due, Landlord shall have all the remedies for default in the payment of rent provided under the terms of this Lease. The provisions of this Article shall survive the expiration or earlier termination of this Lease.

\* \* \*

18.01 Default.

(a) In the event Tenant shall fail to pay the Base Rent, Percentage Rent, additional rent or perform any other obligation involving the payment of money reserved herein within ten (10) days after notice that the same is due, Landlord

shall, in addition to its other remedies provided by law, and in this Lease, have the remedies set forth in subsection (c) below.

\* \* \*

(f) Notwithstanding the foregoing provisions of this Section, in the event Tenant shall fail to perform or shall default in the performance of any term, covenant or condition of this Lease on two (2) or more separate occasions during any twelve-month period, then, even though such failures or defaults may have been cured by Tenant, any further failure or default by Tenant during such twelve-month period shall be deemed a default without the ability of Tenant to cure.

\* \* \*

22.03 Waiver.  The delay or failure of either party to enforce its rights or remedies upon the default of the other party shall not prevent a similar subsequent default from constituting a default under this Lease and shall not be deemed to be a waiver by the nondefaulting party of the right to enforce the terms and provisions of this Lease in the event of the same or any subsequent default.

\* \* \*

22.10 Accord and Satisfaction.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease.

In relevant part, the guaranty provided:

A.  The undersigned does hereby guarantee the full, faithful and timely payment and performance by Tenant of all of the payments, covenants and other obligations of Tenant under or pursuant to the Lease, to the extent of Tenant's obligations thereunder.  If Tenant shall default at any time in the payment of any rent or any other sums, costs or charges whatsoever, or in the performance of any of the other covenants and obligations of Tenant, under or pursuant to the Lease, and any cure periods provided for therein have expired, then the undersigned, at its expense, shall on demand of Landlord fully and promptly, and well and truly, pay all rent, sums, costs and charges to be paid by Tenant, and perform all the other covenants and obligations to be performed by Tenant, under or pursuant to the Lease, and in addition shall on Landlord's demand pay to Landlord any and all sums due to Landlord, including (without limitation) all interest on past due obligations of Tenant, costs advanced by Landlord, and damages and all expenses (including reasonable attorneys' fees and litigation costs), that may arise in consequence of Tenant's default.  The undersigned hereby waives all requirements

of notice of the acceptance of this Guaranty and all requirements of notice of breach or nonperformance by Tenant.

\* \* \*

I. In the event that Landlord should institute any suit against the undersigned for violation of or to enforce any of the covenants or conditions of this Guaranty or to enforce any right of Landlord hereunder, or should the undersigned institute any suit against Landlord arising out of or in connection with this Guaranty, or should either party institute a suit against the other for a declaration of rights hereunder, or should either party intervene in any suit in which the other is a party to enforce or protect its interest or rights hereunder, the prevailing party in any such suit shall be entitled to the fees of its attorney(s) in the reasonable amount thereof, to be determined by the court and taxed as a part of the costs therein.

\* \* \*

N. Notwithstanding anything to the contrary contained herein, the liability of the undersigned under this Guaranty shall not exceed (i) the unamortized portion of the Improvement Allowance (such amount shall be amortized over the seven and one-half ($7^1/_2$%) year period commencing on the Rent Commencement Date, plus (ii) an amount equal to the rental and other charges payable pursuant to the Lease with respect to the twelve (12) month period commencing on the date of Tenant's breach of the Lease which gives rise to Landlord's claim under this Guaranty, and (iii) the costs and expenses incurred by Landlord in enforcing this Guaranty.

The lease stated that Panos was required to begin paying rent on December 1, 2014, but Panos was only able to make a partial rent payment on that date. In fact, Panos never made a full rent payment and stopped making even partial rent payments in March 2016. Plaintiff applied each rental payment that Panos made retroactively to the oldest rental charge. Plaintiff sent Panos notice in July 2016 that Panos was in default because of its failure to pay rent. In September 2016 plaintiff initiated an eviction action against defendant and filed suit against defendant and Panos under the theories of breach of contract, conversion, and claim and delivery.

After a bench trial, the trial court "render[ed] a verdict of $1,345,127.42 against Panos XI and $372,654.39 against [defendant]." Specifically, the trial court determined that Panos owed plaintiff $1,169,650 for the breach of lease claim and $43,800 for the conversion claim. The trial court held that pursuant to the guaranty, defendant owed plaintiff "one year's worth of rent and other periodic expenses beginning on the day that Defendant Panos XI breached the lease," which

the trial court determined to be March 2016.  Using March 2016 as the month of the breach, the trial court concluded that defendant owed $133,672.30 for the breach of guaranty claim.[2]

The trial court also analyzed the attorney fees and costs that Panos and defendant owed plaintiff.  The trial court determined that plaintiff could collect $131,145.50 in reasonable attorney fees from defendant and Panos.  The trial court also held that plaintiff was "entitled to an award of $531.92 in costs" from defendant and Panos.  The trial court then noted that "[a]ny dollar paid by Defendant Panos XI reduces Defendant Goulas's obligation by a dollar, but Panos XI seems unlikely to pay anything against the obligations imposed by the verdicts."  This appeal followed.

## II.  SCOPE OF THE GUARANTY

Defendant argues that the guaranty only covered 12 months of rental obligations following Panos's first breach of the lease in December 2014.  Defendant further contends that he does not owe plaintiff any damages because Panos' rental obligations from December 2014 to December 2015 have been paid.  We disagree.

### A.  STANDARD OF REVIEW

"Following a bench trial, this Court reviews findings of fact for clear error and conclusions of law de novo."  *Florence Cement Co v Vettraino*, 292 Mich App 461, 468; 807 NW2d 917 (2011).  "A finding of fact is clearly erroneous when no evidence supports the finding or, on the entire record, this Court is left with a definite and firm conviction that a mistake has been made."  *King v Mich State Police Dep't*, 303 Mich App 162, 185; 841 NW2d 914 (2013).  Additionally, "questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo."  *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

### B.  ANALYSIS

"[P]laintiff[s] [are] adequately compensated for a breach of contract when damages are awarded by reference only to the terms of the contract."  *Casey v Auto Owners Ins Co*, 273 Mich App 388, 402; 729 NW2d 777 (2006) (citations and quotation marks omitted).  Guaranty contracts are "a special kind of contract," *Bandit Indus, Inc v Hobbs Int'l, Inc*, 463 Mich 504, 511; 620 NW2d 531 (2001), but courts should construe guaranty contracts like they would all other contracts, *Comerica Bank v Cohen*, 291 Mich App 40, 46; 805 NW2d 544 (2010).

"In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument."  *Rory*, 473 Mich at 464.  "A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract."  *Auto Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d

---

[2] As part of the breach of contract claim, the trial court also determined that defendant owed plaintiff $93,053.01 for the improvement allowance that plaintiff provided Panos in the lease because defendant personally guaranteed the improvement allowance.  On appeal, defendant does not challenge the trial court's finding with regard to the improvement allowance.

530 (2015). "[C]ontracts must be read as a whole," *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 447; 886 NW2d 445 (2015), giving "effect to every word, phrase, and clause," while taking pains to "avoid an interpretation that would render any part of the contract surplusage or nugatory," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). Accordingly, "[t]he construction or interpretation of written contracts consists in ascertaining the meaning of the parties, as expressed in the terms of the writing, according to the rules of grammar." *Pendill v Maas*, 97 Mich 215, 218; 56 NW 597 (1893).

"A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written." *Rory*, 473 Mich at 468. Contracts are enforced "according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract." *Id*. "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

A "contract is ambiguous when its provisions are capable of conflicting interpretations. Accordingly, if two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous." *Klapp*, 468 Mich at 467 (citation and quotation marks omitted). Furthermore, "courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity. Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable." *Id*. (citation and quotation marks omitted). "[A]mbiguity is a finding of last resort" that "is to be reached only after all other conventional means of interpretation have been applied and found wanting." *Kendzierski v Macomb Co*, 503 Mich 296, 311; 931 NW2d 604 (2019) (citations and quotation marks omitted). Accordingly, this Court "will not create ambiguity where the terms of the contract are clear." *Id*. (citation and quotation marks omitted). Thus, permitting a court to make its own determination of reasonableness and to rewrite a contract accordingly when a contract is unambiguous "is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Kendzierski*, 503 Mich at 312 (citation and quotation marks omitted).

When a contract is ambiguous, the ambiguity "may either be patent or latent." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010). Patent ambiguities appear "from the face of the document." *Id*. Accordingly, "extrinsic evidence may not be used to identify a patent ambiguity." *Id*. Latent ambiguities, however, do "not readily appear in the language of a document, but instead arise[] from a collateral matter when the document's terms are applied or executed." *Id*. at 668. "A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Id*. (citation and quotation marks omitted). Courts should consider extrinsic evidence to determine whether a contract is latently ambiguous. *Id*. "[I]f a contract is ambiguous, then extrinsic evidence is admissible to determine the actual intent of the parties." *Id*. at 667 (citation and quotation marks omitted). Finally, "[w]here the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Ed Ass'n, MEA/NEA v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996).

It is undisputed that Panos breached the lease. It also is undisputed that defendant signed a personal guaranty for the lease between Panos and plaintiff. As stated in ¶ N of the guaranty, defendant guaranteed to pay plaintiff "an amount equal to the rental and other charges payable pursuant to the Lease with respect to the twelve (12) month period commencing on the date of Tenant's breach of the Lease which gives rise to Landlord's claim under this Guaranty." Defendant's liability under the guaranty, if any, turns on the meaning of this phrase and specifically when the 12-month period begins. Defendant argues that the 12-month period began when Panos first breached the lease in December 2014, but plaintiff argues that the 12-month period instead began in March 2016 because Panos's breach of the lease in March 2016 led to these proceedings. The lease and guaranty fail to define the operative words in this phrase—breach and claim—and, therefore, we must turn to the principles of contract interpretation to determine when the 12-month period began.

The meaning of this phrase is not immediately apparent, but that does not necessarily mean that it is ambiguous. Rather, "the date of Tenant's breach of the Lease which gives rise to Landlord's claim under this Guaranty" is not ambiguous on its face. Thus, the phrase is not patently ambiguous. See *Shay*, 487 Mich at 667. Consequently, if the phrase is ambiguous it can only be latently ambiguous, or, stated another way, that its words suggest two or more possible meanings. See *id*. at 667-668. But before turning to any extrinsic evidence, we must first attempt to define the phrase based on the language of the guaranty itself, through traditional methods of contract interpretation such as using a dictionary to define undefined terms. See *Auto Owners Ins Co*, 310 Mich App at 145.

*Black's Law Dictionary* (11th ed) defines "breach" as "[a] violation or infraction of a law, obligation, or agreement, especially of an official duty or a legal obligation, whether by neglect, refusal, resistance, or inaction." Similarly, "breach of contract" is defined as a "[v]iolation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." *Id*. Furthermore, the phrase "gives rise to" has recently been defined by our Supreme Court as synonymous with a triggering action that something "originates" from. See *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 182; 931 NW2d 539 (2019) ("[A]n event has "giv[en] rise to the cause of action" when that event "origin[ates]" a "basis for suing" and "entitle[s] one person to obtain a remedy in court." In other words, an "event giv[es] rise to a cause of action" when it triggers a person's ability to obtain a remedy in court.") (first alteration added).[3] Finally, "claim" is defined as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional." *Black's Law Dictionary* (11th ed). Thus, while a breach occurs as soon as one party violates a contract, a "claim" does not come into existence until a party takes action to enforce its rights. Additionally, the phrase "the date of Tenant's breach of the Lease which gives rise to Landlord's claim under this Guaranty," using less technical language, simply means "the date of Panos's violation of the lease which caused plaintiff to assert its known rights under the Guaranty." Consequently, as relevant to this

---

[3] We note that the contract addressed a claim, not a cause of action. Thus, we need not address how the meaning of the phrase would change if the phrase "cause of action" was used instead of the word "claim."

case, Panos breached the lease in December 2014, but plaintiff's claim did not arise until it asserted its existing right to enforce the terms of the lease against Panos.

Panos breached the lease in December 2014 when it failed to fully pay rent, but plaintiff did not assert a claim, i.e. take legal action to enforce the lease, at that time. Rather, plaintiff waited until Panos stopped paying rent altogether in March 2016 before asserting a claim. Although plaintiff could have brought action to enforce its rights earlier than March 2016, it permissibly chose to wait until Panos stopped paying rent altogether before taking action to enforce its rights. Thus, "the date of Tenant's breach of the Lease which gives rise to Landlord's claim under this Guaranty" is March 2016, the date of Panos's breach of the lease ultimately resulting in plaintiff's filing of suit. Consequently, under the plain language of the guaranty, defendant must pay plaintiff "an amount equal to the rental and other charges payable pursuant to the Lease with respect to the twelve (12) month period commencing [in March 2016]."[4]

Because we find that the language of the guaranty is clear and unambiguous regarding when the 12-month period that defendant is liable for unpaid rent began, we thus need not consider defendant's remaining arguments on this issue. Finally, defendant argues that holding that the 12-month period beginning at any point other than December 2014 is an absurd result because it essentially allows plaintiff to choose when the 12-month period began based on when it asserts its claim. While defendant might not view this result as "fair," it is not absurd. Rather, this result is itself a result of the language chosen by the parties to the contract, and thus respects the "freedom of individuals freely to arrange their affairs via contract." *Rory*, 473 Mich at 468. It also is very common for a plaintiff to have almost unlimited discretion of when to bring an action to enforce its rights provided it complies with the statute of limitations, which themselves often provide years in which to do so.[5] Thus, even though defendant likely views this result as "unfair" we simply are called upon to apply the plain meaning of the guaranty as written.

III. ATTORNEY FEES

Defendant argues that he is not responsible for any attorney fees that plaintiff incurred. We disagree.

---

[4] Because the phrase's meaning is clear from the plain language of the guaranty it is not ambiguous and, therefore, extrinsic evidence cannot be used to interpret it or to create an ambiguity. See *In re Smith Trust*, 480 Mich at 24.

[5] Moreover, the upshot of defendant's position is that it would have been "more fair" to impose an obligation on plaintiff to sue immediately upon defendant's first breach of the contract or lose the right to collect some portion of the damages, rather than to wait and see if defendant resumed compliance with the lease, and thereby possibly forgo suit completely. It is not clear why defendant thinks an interpretation which would have mandated a suit against him is more fair than one which did not.

## A. STANDARD OF REVIEW

"This Court reviews the trial court's decision to award attorney fees for an abuse of discretion." *Featherston v Steinhoff*, 226 Mich App 584, 592-593; 575 NW2d 6 (1997). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). Similarly, "[a]n error of law necessarily constitutes an abuse of discretion." *Denton v Dep't of Treasury*, 317 Mich App 303, 314; 894 NW2d 694 (2016).

## B. ANALYSIS

"As a general rule, attorney fees are not recoverable from a losing party unless authorized by a statute, court rule, or other recognized exception." *Great Lakes Shores, Inc v Bartley*, 311 Mich App 252, 255; 874 NW2d 416 (2015). "Contractual provisions for payment of reasonable attorney fees are judicially enforceable. In other words, a contractual clause providing that in the event of a dispute the prevailing party is entitled to recover attorney fees is valid." *Fleet Business Credit v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007) (citations and quotation marks omitted).

### 1. WHETHER ANY ATTORNEY FEES CAN BE AWARDED

The trial court analyzed the attorney fees that Panos and defendant owed plaintiff and determined that reasonable attorney fess amounted to $131,145.50 for plaintiff's entire claim against Panos. As stated earlier, the trial court also noted that "[a]ny dollar paid by Defendant Panos XI reduces Defendant Goulas's obligation by a dollar, but Panos XI seems unlikely to pay anything against the obligations imposed by the verdicts."

Paragraph A of the guaranty provides that defendant guaranteed to pay "any and all sums due to Landlord, including (without limitation) all interest on past due obligations of Tenant, costs advanced by Landlord, and damages and all expenses (including reasonable attorneys' fees and litigation costs), that may arise in consequence of Tenant's default." Expenses as defined in ¶ A specifically encompass attorney fees and litigation costs. The guaranty also provides in ¶ I that "the prevailing party in any such suit shall be entitled to the fees of its attorney(s) in the reasonable amount thereof, to be determined by the court and taxed as a part of the costs therein." Paragraph I clearly states that defendant is responsible for attorney fees that plaintiff may incur in litigation if plaintiff is the prevailing party.

Paragraph N, however, states that "[n]otwithstanding anything to the contrary contained herein, the liability of the undersigned under this Guaranty shall not exceed . . . the costs and expenses incurred by Landlord in enforcing this Guaranty." Defendant argues that ¶ N does not require him to pay attorney fees because attorney fees were specifically included in ¶¶ A and I, but not in ¶ N.

"When a document repeatedly uses a term or phrase, we assume that it carries the same meaning throughout." *Thiel v Goyings*, 504 Mich 484, 502; 939 NW2d 152. The guaranty addressed expenses plaintiff was entitled to receive if Panos defaulted on the lease in ¶ A and, in creating the guaranty, specifically included attorney fees. When ¶ A expressly addressed attorney

fees, they simply effectuated a desire to establish that attorney fees were included as part of the expenses that defendant guaranteed to pay. Consequently, when ¶ N discussed "expenses" this necessarily included attorney fees. Additionally, ¶ I stated that the prevailing party was entitled to attorney fees. Defendant's proposed interpretation of ¶ N as not requiring him to pay attorney fees would be contrary to the fact that the plain language of ¶ A specifically included attorney fees as one of the expenses he guaranteed to pay. Defendant's proposed interpretation of ¶ N also would be inconsistent with the plain language of ¶ I stating that the prevailing party is entitled to attorney fees. Thus, because defendant's proposed interpretation of ¶ N is inconsistent with the plain language of ¶¶ A and I, we cannot adopt it as the proper interpretation of ¶ N. See *Klapp*, 468 Mich at 468; *Kyocera*, 313 Mich App at 447. Rather, the expenses addressed in ¶ N encompass attorney fees. Thus, defendant is liable for attorney fees under the guaranty.

## 2. WHICH ATTORNEY FEES CAN BE AWARDED

Finally, defendant argues that if this Court determines he owes plaintiff attorney fees, he only owes plaintiff attorney fees it incurred when enforcing the guaranty. He claims that he is not responsible for any attorney fees plaintiff incurred on the eviction, conversion, or claim and delivery issues. We agree.

After Panos stopped making rental payments, plaintiff first initiated an eviction action against Panos, before bringing suit against defendant and Panos based on the legal theories of breach of contract, conversion, and claim and delivery. The trial court held that Panos breached the lease and that defendant breached the personal guaranty, and it granted plaintiff damages from both Panos and defendant. The trial court also concluded that Panos owed plaintiff damages under the common-law theory of conversion. Finally, the trial court determined that Panos and defendant owed plaintiff reasonable attorney fees that it incurred from the eviction action and each of the counts it stated in its complaint. The trial court found support for its decision in ¶¶ A and I of the guaranty.

Paragraph A establishes that defendant guaranteed to pay plaintiff's reasonable attorney fees incurred by Panos's default of the lease.[6] Similarly, ¶ I establishes that defendant guarantees to pay plaintiff for attorney fees related to violations of or enforcement of the guaranty.[7] Finally,

---

[6] In relevant part, ¶ A provides:

> If Tenant shall default at any time in the payment of any rent or any other sums . . . then the undersigned, at its expense, shall on demand of Landlord fully and promptly, and well and truly, pay all rent, sums, costs and charges to be paid by Tenant . . . including (without limitation) . . . all expenses (including reasonable attorneys' fees and litigation costs)[] that may arise in consequence of Tenant's default.

[7] In relevant part, ¶ I provides:

> In the event that Landlord should institute any suit against the undersigned for violation of or to enforce any of the covenants or conditions of this Guaranty . . .

as noted earlier, ¶ N limits defendant's liability under the guaranty to just three categories of payments. Specifically, ¶ N states that "[n]otwithstanding anything to the contrary contained herein, the liability of the undersigned under this Guaranty shall not exceed (i) the unamortized portion of the Improvement Allowance," (ii) rent for the 12-month period addressed earlier in Part II, and (iii) attorney fees to enforce the guaranty itself. Thus, because defendant is only liable for this limited set of costs, he is only liable for attorney fees incurred by plaintiff in recovering "the unamortized portion of the Improvement Allowance" and rent for the 12-month period addressed earlier in Part II; those are the only costs that defendant actually guaranteed to pay which were caused by Panos's default of the lease. Stated differently, plaintiff can only recover actual damages caused by Panos related to the improvement allowance and the 12-month rental period. Thus, any other damages caused by Panos fall outside the scope of the guaranty. Consequently, any attorney fees incurred to recover damages or costs other than the improvement allowance or the 12-month rental period were not attorney fees incurred to enforce the guaranty. Furthermore, any contradiction between ¶ N on the one hand and ¶¶ A and I on the other is cured by first clause of ¶ N, which provides that in the event of a conflict, the terms of ¶ N control: "[n]otwithstanding anything to the contrary contained herein." Thus, defendant is not liable for attorney fees related to plaintiff's eviction, conversion, or claim and delivery allegations; defendant is liable only for attorney fees related to enforcement of the guaranty: recovery of the improvement allowance and the 12-month rental period. We reverse this portion of the trial court's order and remand for the trial court to reconsider the attorney fees for which defendant is liable.

## IV. CONCLUSION

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Jane E. Markey
/s/ Michael F. Gadola

---

the prevailing party in any such suit shall be entitled to the fees of its attorney(s) in the reasonable amount thereof, to be determined by the court and taxed as a part of the costs therein.