*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANNISSA STENGER,

        Plaintiff-Appellant,

v

FERRIS STATE UNIVERSITY and THE BOARD
OF TRUSTEES OF FERRIS STATE UNIVERSITY,

        Defendants-Appellees.

UNPUBLISHED
December 04, 2024
12:18 PM

No. 358050
Court of Claims
LC No. 20-000084-MK

Before: BORRELLO, P.J., and N. P. HOOD and YOUNG, JJ.

PER CURIAM.

Plaintiff, Annissa Stenger, appeals by right Court of Claims orders granting summary disposition to defendants, Ferris State University and the Board of Trustees of Ferris State University (collectively, FSU), under MCR 2.116(C)(10) on Stenger's claims for breach of contract and unjust enrichment. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of FSU's response to the COVID-19 pandemic during the spring of 2020. Stenger filed this action in the Court of Claims on May 13, 2020.[1] Stenger alleged in her complaint that in March 2020, while she was enrolled as a student at FSU, the university moved all classes online and cancelled on-campus activities as a result of the COVID-19 pandemic and thereby deprived Stenger of the benefit of in-person instruction and student activities for which she had paid tuition and fees. Stenger alleged that her online classes were not commensurate with the same courses when taught in person, that she could not receive the benefits of services for which she had paid, and that FSU had not provided an adequate refund of tuition or fees.

---

[1] This action was brought as a purported class action. Because the issue of class certification is not before us, we will only refer to the named plaintiff.

Stenger alleged that FSU breached a contract to provide in-person instruction in exchange for tuition and breached a contract to provide "services" to students in exchange for other fees that were charged. Stenger did not attach these alleged contracts to the complaint, but she asserted that they were in FSU's possession. In the alternative, Stenger alleged that FSU was unjustly enriched by retaining all of the tuition charged without providing in-person instruction for the entire semester and by retaining all of the charged fees without providing the services funded by those fees for the entire semester.

FSU moved for summary disposition under MCR 2.116(C)(8), arguing that Stenger had not identified the existence of any contract that FSU actually breached and that FSU never made promises of the type Stenger alleged had been breached. FSU also argued that it was not unjustly enriched because it did not experience a financial windfall under the circumstances and it was not inequitable for FSU to retain the tuition and fees collected.

Stenger opposed the motion. She argued that there were express or implied contracts with respect to tuition and fees. Stenger contended that FSU's contractual obligation to provide live, in-person instruction was at least partially evidenced by FSU's course catalog listings that designated particular classes as in-person classes and others as online classes, thereby creating corresponding expectations in students when registering for classes. A portion of the class schedule listing, which showed in-person and online courses, was attached to Stenger's response. Regarding fees, Stenger attached evidence that students were required to pay various fees to fund activities that included on-campus entertainment and access to facilities such as the Racquet and Fitness Facility. Stenger also maintained that FSU was unjustly enriched because it failed to provide a full semester of in-person instruction and access to services as secured by the tuition and fees charged.

The trial court entered an order requiring Stenger to submit "any and all documents currently in her possession that forms the basis for her assertion that a written express or implied contract exists with respect to receiving only in-person instruction."

Stenger responded to this order by submitting 12 exhibits consisting of "a variety of documents provided by the University to its students describing the various academic program offerings and contain[ing] some of the terms of the contract between the University and its students for live in-person instruction." The exhibits included portions of the 2020 Spring Term Class Schedule Listings showing whether certain classes were designated as in-person classes with meeting times and locations or as fully online classes. The other exhibits, which were essentially promotional materials for the university, contained what Stenger characterized as "a wide array of promises and representations by the University that it would provide in-person instruction on the University's campuses if students paid the specified tuition and registered for classes . . . ."

FSU responded to Stenger's production of documents by producing more documents. Of particular relevance, the class schedule listings relied on by Stenger were available from the Course Catalog website and FSU produced and quoted a portion of the Course Catalog website home page stating as follows:

The University reserves the right to change the contents of this Catalog at any time without notice. Because this Catalog is for informational purposes only, it does not establish any contractual relationship with the University.

Thus, FSU argued that the class schedule listings relied on by Stenger clearly did not create an express or implied contract for exclusively in-person instruction. FSU further argued that the other materials submitted by Stenger were merely informational brochures and not contracts.

The trial court issued a written opinion and order granting in part and denying in part FSU's summary disposition motion. The court considered the motion under MCR 2.116(C)(8) with respect to the unjust enrichment claims and MCR 2.116(C)(10) with respect to the breach of contract claims. The trial court concluded that FSU was entitled to summary disposition on Stenger's breach of contract claims regarding tuition and fees because none of the evidence produced by Stenger showed the existence of contractual promises by FSU to provide exclusively in-person instruction or particular services under all circumstances and there accordingly was no genuine issue of material fact that Stenger could not establish the existence of the contractual terms she sought to enforce relative to tuition and fees. However, the trial court denied FSU's summary disposition on the unjust enrichment claims because the court concluded that Stenger had sufficiently pleaded those claims.

FSU subsequently moved for partial summary disposition and sought dismissal of Stenger's unjust enrichment claim regarding tuition under MCR 2.116(C)(10). FSU argued that it was entitled to summary disposition on Stenger's tuition-based unjust enrichment claim because there was no genuine issue of material fact that FSU charged the same tuition per credit hour for both online and in-person classes and therefore would have charged Stenger the same tuition regardless of whether she had registered for in-person or online courses. FSU attached evidence of these tuition rates supporting its argument to its motion, and the university contended that this evidence showed it did not receive a windfall and that an unjust enrichment claim based on tuition could not survive.

The trial court issued a written opinion and order granting the motion because there was undisputed evidence that tuition was based on a per-credit-hour rate that was consistent between in-person and online courses, which established that FSU was not unjustly enriched by maintaining the same tuition charges when it transitioned to remote learning during the pandemic.

FSU subsequently filed another motion for summary disposition under MCR 2.116(C)(10), seeking dismissal of the final remaining claim for unjust enrichment regarding fees. FSU submitted evidence that Stenger paid four fees during the Spring 2020 semester: a $47 Student Health Fee, a $16 Racquet Facility Fee, a $20 Student Activity Fee, and a $1 Student Government Fee. The evidence further reflected the purposes of these fees and how Stenger benefitted from the services those fees funded.

The Student Health Fee was collected to help fund and maintain the Birkam Health Center, where FSU students could obtain healthcare services. The fee was not mandatory, and students could obtain a refund by making a request by the fifth day of classes for the semester. By paying the fee, students were granted access to the services offered at the Birkam Health Center. However, if a student had obtained the refund and then still needed services from the Birkam

-3-

Health Center, the student would still be permitted to obtain services by paying the $47 fee at that time and agreeing not to take the refund of this fee the next semester. Stenger paid the Student Health Fee for the Fall 2019 semester and used the services provided by the Birkam Health Center once during that semester. Stenger also paid the Student Health Fee for the Spring 2020 semester and used services provided by the Birkam Health Center twice during that semester. Both of her visits during the Spring 2020 semester were in-person visits that occurred before the pandemic arrived in full force. The Birkam Health Center remained open and continued to provide healthcare services to students throughout the entire Spring 2020 semester, although some services were provided in a modified, remote form after the middle of March.

The Racquet Facility Fee was used to help fund and maintain the Racquet and Fitness Center. This fee also was not mandatory, and students could obtain a refund by making a request by the fifth day of classes for the semester. Students who paid this fee could use the Racquet and Fitness Center throughout the semester. Students who obtained the refund could still use the facility by paying either a $16 fee on the first visit or $8 for each visit with a separate charge for court time. Stenger paid the Racquet Facility Fee for both the Fall 2019 semester and Spring 2020 semester, but she apparently did not ever use the facility during that time. The Racquet and Fitness Center was closed from the middle of March 2020 until the end of the semester due to the pandemic, but FSU continued to pay student employees and staff who worked at the Racquet and Fitness Center through the end of the semester and the operating costs for the facility did not substantially decrease.

The Student Activity Fee was used to partially fund an employee with the title "Student Activities Specialist" and to provide funding for approved student organizations and on-campus entertainment and events. The Student Activities Specialist remained employed and continued to work during the entire Spring 2020 semester. Student Activity Fee funds were used for events that occurred before the middle of March 2020, and funds that would have paid for events that were cancelled or rescheduled due to the pandemic were carried over to be used for the same general purposes in subsequent semesters. The Student Government Fee provided funding to the Student Government Association. Neither the Student Activity Fee nor the Student Government Fee were mandatory.

The trial court granted FSU's motion for summary disposition and dismissed the remaining unjust enrichment claim related to fees. The court reasoned:

> The fees at issue all shared common characteristics: they were paid voluntarily by plaintiff at the beginning of the semester and they were paid regardless of what plaintiff did or did not do during the semester with respect to any services offered— or not offered—by defendant. Plaintiff had an opportunity to seek a refund of the fees within the time provided, but, in the case of each of the fees at issue, she chose not to do so. Plaintiff has not submitted any evidence to refute defendants' assertions of how or why the fees were imposed. In other words, she has not refuted the idea that she had no expectation that the fees would only be imposed upon her utilization of certain services. Instead, she agreed—tacitly or otherwise when she did not request a refund—to allow the University to retain the fees regardless of how much or if she utilized any services. Thus, plaintiff's "rightful position" was that the fees were imposed regardless of how much she utilized, or did not utilize,

-4-

any services provided by the University. On this evidence, there is no dispute that plaintiff does not require the use of equity to restore her to her rightful position. See [*Wright v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019)]. See also *Smith Living Trust v Erickson Retirement Communities*, 326 Mich App 366, 397; 928 NW2d 227 (2018) (discussing an unjust enrichment claim where the plaintiff previously agreed that no refund could be sought).

Furthermore, with respect to the health services, student activity, and student government fees, the record evidence reveals that defendant provided some level of services to students notwithstanding the challenges brought on by the COVID-19 pandemic.[3] And in the case of the student services fee, the funds that were collected but not used are, according to defendants' unrebutted evidence, set aside for future student services, i.e., not for the purpose of enriching the University but instead to be set aside to benefit students such as plaintiff. Lastly, as it concerns the racquet center fee, the evidence produced by defendant shows that plaintiff paid the fee in the past, but did not utilize the center. It cannot be said that defendants were unjustly enriched by retention of a fee that plaintiff knew, based on past experience, was imposed regardless of whether she accessed the facility. That plaintiff did not access the facility during the semester at issue does not mean defendants were unjustly enriched or that plaintiff yielded excess benefits.

Further underscoring the idea that the unjust enrichment claim must be summarily dismissed is defendants' evidence that the fees at issue were directed toward a number of costs that were used to support the facilities at issue, such as maintenance costs and salaries of employees. In other words, plaintiff paid fees that were designed to support certain necessary employees and maintenance efforts, and defendant continued to pay the salary and wages of those employees and to perform its maintenance obligations. Plaintiff, as well as other university students, receives a benefit from continuing to have those facilities maintained and staffed. Therefore, when the only documentary evidence demonstrates that the fees went where they were expected to go and for the purposes for which they were earmarked, it cannot be said that defendants' decision not to refund the fees at issue was unjust.

---

[3] Plaintiff visited the Birkam Health Center on two occasions during the semester, so she would have been charged the fee even if she had opted for a refund.

---

This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Zwiker v Lake Superior State Univ*, 340 Mich App 448, 473; 986 NW2d 427 (2022). Summary disposition is proper under MCR 2.116(C)(10) "if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law." *Id*. at 473-474. "The existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). We also review de novo as a question of law whether contract language is ambiguous. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). "Whether a specific party has been unjustly enriched is generally a question of fact," but "whether a claim for unjust enrichment can be maintained is a question of law, which we review de novo." *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006). This Court "review[s] de novo a trial court's dispositional ruling on an equitable matter." *Id*. "When reviewing a decision under MCR 2.116(C)(10), this Court considers the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Zwiker*, 340 Mich App at 473.

## III. ANALYSIS

### A. BREACH OF CONTRACT

Stenger first argues on appeal that the trial court erred by concluding that there was no evidence of contracts for exclusively in-person instruction or particular types of student services and dismissing her breach of contract claims on those grounds.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Mich v State of Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). Moreover, the party claiming a breach of contract is required to prove the "*terms*" of the contract that the defendant allegedly breached. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017) (emphasis added).

A contract may be express or implied. *McInerney v Detroit Trust Co*, 279 Mich 42, 46; 271 NW 545 (1937). An express contract has been defined as "one in which the terms were openly uttered and avowed at the time of the making" or "one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or orally, at the time it is entered into." *Id*. (quotation marks and citations omitted).

Alternatively, a contract may instead be implied from the circumstances:

"There are two kinds of implied contracts; one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended." [*McInerney*, 279 Mich at 49 (quotation marks and citation omitted); see also *City of Highland Park v State Land Bank Authority*, 340 Mich App 593, 604; 986 NW2d 638 (2022) (stating the same rule).]

Thus, an implied-in-fact contract requires mutual assent just like any other contract; the difference is that in the case of an implied-in-fact contract, the mutual assent is inferred from the

parties' words and actions since the parties did not directly express their mutual assent and intent to contract. *McInerney*, 279 Mich at 49; *Erickson v Goodell Oil Co*, 384 Mich 207, 212; 180 NW2d 798 (1970). "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." *Erickson*, 384 Mich at 212. "A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of [people], show a mutual intention to contract." *Id*. at 211-212.

In contrast, the concept of an implied-in-law contract—which is a quasi-contract—is intricately linked with the concept of unjust enrichment. See *McInerney*, 279 Mich at 49; *City of Highland Park*, 340 Mich App at 604 ("Quasi-contract doctrine is itself a subset of the law of unjust enrichment.") (quotation marks and citation omitted). We will address Stenger's unjust enrichment claims below. Here, we focus on the issues of express and implied-in-fact contracts.

"A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich*, 497 Mich at 235. "Fundamentally, a contract is a promise or a set of promises for which the law recognizes a remedy in the event of a breach of those promises. 1 Restatement Contracts, 2d, § 1, p 5. A promise, in turn, is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.' *Id*. at § 2, p 8." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 212; 933 NW2d 363 (2019). "Before a contract can be completed, there must be an offer and acceptance. . . . Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich App at 452-453 (quotation marks and citation omitted). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*. at 454 (quotation marks and citation omitted).

Here, Stenger essentially argues that she paid for and expected in-person delivery of education and availability of services, that FSU failed to provide in-person instruction and services in accordance with the parties' agreements, and that she is therefore entitled to a partial refund of tuition and fees.

Regarding tuition, the trial court concluded that there was no evidence of any language showing that FSU had ever made a promise to provide exclusively in-person instruction under all circumstances in exchange for tuition. On appeal, Stenger does not cite any language in any of the documents in the record evidencing such a promise. Furthermore, there is record evidence suggesting that FSU reserved its right to make changes its delivery of instruction. The FSU catalog states, "The University reserves the right to change the contents of this Catalog at any time without notice. Because this Catalog is for informational purposes only, it does not establish any contractual relationship with the University." There is simply no evidence that an express contract exists that contains a promise by FSU that it would exclusively provide in-person instruction under all circumstances. *McInerney*, 279 Mich at 46; *Van Buren Charter Twp*, 319 Mich App at 554; *Bodnar*, 327 Mich App at 212.

Stenger instead focuses on arguing that there was an implied-in-fact contract for in-person instruction, based on FSU's publications and the parties' course of conduct in light of the historical practice of in-person college education. She contends that before the COVID-19 pandemic, both students and the university reasonably expected that a class would be held in person unless that class was otherwise designated as an online class when students registered. Although our Supreme Court has stated that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom," *Booker v Grand Rapids Med College*, 156 Mich 95, 99-100; 120 NW 589 (1909), and the United States Supreme Court has also appeared to concede that a student may generally have an "implied contract right to continued enrollment free from arbitrary dismissal," *Regents of the Univ of Mich v Ewing*, 474 US 214, 223; 106 S Ct 507; 88 L Ed 2d 523 (1985),[2] those statements do not necessarily translate to an implied contractual right to in-person instruction under all circumstances.

Nonetheless, as quoted previously, FSU included a reservation of rights clause in its course catalog indicating that nothing in the catalog created a contractual relationship. Thus, assuming without deciding that there was an implied-in-fact contract generally agreeing to exchange tuition for educational instruction, the reservation of rights language makes clear that there was no offer—and thus no meeting of the minds—regarding any particular format for providing educational instruction. *Kloian*, 273 Mich App at 452-454; *McInerney*, 279 Mich at 49; *Erickson*, 384 Mich at 212. That conclusion is sufficient to resolve this issue on appeal.

Because there is no evidence of the contractual term that Stenger alleges was breached regarding tuition and in-person instruction, FSU was entitled to summary disposition on Stenger's contract claim with respect to tuition.

Next, Stenger argues that the trial court erred by concluding that there was no contract for specific services to be provided in exchange for fees. Stenger argues that this constituted error because discovery had not been completed. However, Stenger does not provide any indication of what evidence she believes would actually be located through further discovery. She merely argues that she should be permitted to conduct discovery in order to find the relevant contract. A "party opposing summary disposition cannot simply state that summary disposition is premature without identifying a disputed issue and supporting that issue with independent evidence." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292; 769 NW2d 234 (2009). It is Stenger's burden to prove the existence of the contract terms she seeks to enforce. *AFT Mich*, 497 Mich at 235. Because Stenger has not demonstrated that further discovery "stands a fair chance of uncovering factual support for the opposing party's position," summary disposition was not premature. *Froling Trust*, 283 Mich App at 292.[3] Stenger has not

---

[2] As the United States Supreme Court recognized, *Booker* is "an antiquated race discrimination decision of the Michigan Supreme Court (whose principal holding has since been overtaken by events) . . . ." *Ewing*, 474 US at 223 n 7. Nonetheless, the United States Supreme Court appeared to agree that there remained a general implied contractual right to continued enrollment without arbitrary dismissal from the university.

[3] For the same reasons, we reject Stenger's claim that she should have been permitted to conduct further discovery to find evidence of her alleged contract regarding in-person instruction.

demonstrated that the trial court erred by granting summary disposition in FSU's favor on the contract claim regarding fees.

## B. UNJUST ENRICHMENT

Next, Stenger argues that the trial court erred by dismissing her unjust enrichment claims regarding tuition and fees.

"Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, [a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Morris Pumps*, 273 Mich App at 193 (quotation marks and citation omitted; alteration in original). "The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another." *Id*. at 194. To sustain a claim that a contract should be implied in law to prevent unjust enrichment, a plaintiff must show: "(1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain." *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 546; 473 NW2d 652 (1991) (opinion by RILEY, J.) (quotation marks and citation omitted); see also *Zwiker*, 340 Mich App at 482 ("To show that a benefit would unjustly enrich the defendant, the plaintiff must establish that the defendant received a benefit from the plaintiff and that it would be inequitable for the defendant to keep the benefit.").

Here, there was record evidence that FSU charged the same tuition for in-person and online courses. There was also evidence that although some services or events became unavailable during the pandemic, others continued in modified form and the fees continued to fund university expenses for which the fees were designated and that the university continued to incur during the pandemic. The evidence reflects that unused funds were carried over to the next term to be used for their designated purpose. Considering that the changes were necessitated by an unexpected global pandemic, that FSU still provided the essence of what it had intended to provide— educational instruction and various services for students—throughout the pandemic, that the fees continued to fund staff and maintenance expenses in accordance with the ordinary general purpose of the fees, and that there was no evidence of any agreement to provide education and services in any particular format, it is not *inequitable* or *unjust* for FSU to retain the tuition and fees it collected. *Id*.; see also *Dumas*, 437 Mich at 546 (opinion by RILEY, J.) (concluding that there was no unjust enrichment when an employer made changes to the compensation plan that were not prohibited by contractual agreement with the employees). FSU was entitled to summary disposition on these unjust enrichment claims.

## IV. CONCLUSION

Stenger has not shown that the trial court's decisions granting summary disposition and dismissing her claims were erroneous. To the extent our reasoning on any of the above issues in this opinion differs from that of the trial court, "[w]e will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs." *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 449; 886 NW2d 445 (2015).

Affirmed.

/s/ Stephen L. Borrello
/s/ Noah P. Hood
/s/ Adrienne N. Young